**Ralph FELDMAN and Mark Loren, Individually, and for the benefit of others similarly situated, Plaintiffs,**

v.

**GREAT NORTHERN RAILWAY COMPANY et al., Defendants.**

**No. 76 Civ. 2837 (LFM).**

United States District Court,
S. D. New York.

March 16, 1977.

Joseph M. Pogostin, New Rochelle, N. Y., for plaintiffs.

Davis, Polk & Wardwell, New York City, for defendant Burlington Northern Inc.; by James W. B. Benkard and James L. Kerr, New York City.

## OPINION

MacMAHON, District Judge.

These cross-motions for summary judgment on stipulated facts, under Rule 56,

Fed.R.Civ.P., present the question of whether recent congressional enactments,[1] repealing the long-standing prohibition on private ownership of, and speculation in, gold, also repealed the "Gold Clause Resolution"[2] which prohibited enforcement of any contractual clause providing for payment of an obligation in gold or any amount of money measured by gold. We conclude that the Gold Clause Resolution has not been repealed and that it is still in full force and effect.

## FACTS

Plaintiffs are the holders of Great Northern Railway Company General Mortgage 4½% Gold Bonds, Series D ("the bonds"). The bonds were issued under a trust indenture, dated January 1, 1921, and provided for semi-annual interest payments until maturity on July 1, 1976, when the principal amount of $1,000 per bond would become payable. Both principal and interest were payable "in gold coin of the United States of America of or equal to the standard of weight and fineness as it existed on the first day of July, 1921. . . ."

Defendant, Burlington Northern Inc. (successor obligor of the bonds),[3] has offered to pay plaintiffs the $1,000 face amount of each bond, dollar for dollar, in currency of the United States. Plaintiffs have refused to accept the face amount of the bonds in dollars, contending that they are entitled to the market value, as of the maturity date, of the quantity of gold represented by the gold coin specified in the bonds as the medium of payment.

The parties stipulate that due to inflation, $6,523.94 was the market value on July 1, 1976 of the quantity of gold represented by $1,000 in gold coin of the standard of weight and fineness specified in the bonds.

Thus, if plaintiffs' contention is correct, holders of these bonds would be entitled to more than six and one-half times the face amounts. .

It appears that the subject bonds are the first "gold clause" bonds to mature since the lifting of restrictions on private gold ownership. Two other courts, however, have recently considered the application of the Gold Clause Resolution to lease obligations, and both share our conclusion that the Resolution is still in effect. See *Equitable Life Assur. Soc. v. Grosvenor,* 426 F.Supp. 67 (W.D.Tenn., 1976); *Henderson v. Mann Theatres Corp.,* 65 Cal.App.3d 397, 135 Cal.Rptr. 266 (1976).

## DISCUSSION

An initial problem is presented by the fact that the actual medium of payment specified in the bonds is no longer available. The bonds call for payment in gold coin of the United States, but the United States has not issued gold coin for more than forty years, all gold coin has been officially withdrawn from circulation and converted to bullion, and currency of the United States is no longer redeemable in gold.[4] Plaintiffs apparently assume that, since the specified gold coin is unavailable, they are entitled to an equivalent amount of *any* legal tender, calculated on the weight and relative value of the quantum of gold contained in 1921 gold coin. Another possibility not suggested by either party is that, if payment in gold were enforced literally according to the terms of the bonds, defendants would be entitled to gold coin, presumably available to some extent, and probably at great expense, in the numismatic market. In view of our conclusion that the Gold Clause Resolution is still in force, we need not pass on either of these possibilities.

1. Act of September 21, 1973, Pub.L. 93–110, 87 Stat. 352, Tit. I; Act of August 14, 1974, Pub.L. 93–373, 88 Stat. 445.

2. Joint Resolution of June 5, 1933, 31 U.S.C. § 463.

3. Burlington Northern Inc. became successor obligor of the bonds with the merger of Great

Northern Railway Company into Burlington Northern on March 2, 1970. Citibank, N.A., corporate successor to the First National Bank of the City of New York and First National City Bank, is the successor trustee under the 1921 indenture.

4. See 31 U.S.C. §§ 315b, 408a.

## THE GOLD CLAUSE RESOLUTION

When Congress enacted the Gold Clause Resolution (set out in full in the margin),[5] it plainly intended to make gold clauses unenforceable. In the preamble to the Resolution, Congress found that such clauses requiring payment in gold or a particular kind of coin "obstruct the power of the Congress to regulate the value of the money of the United States, and are inconsistent with the declared policy of the Congress to maintain at all times the equal power of every dollar . . . ." The Resolution declared any such provisions to be against public policy and provided:

"Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts."

In response to the expected constitutional challenge to the Resolution, the Supreme Court, in *Norman v. Baltimore & O. R. R.*, 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885 (1935), discussed extensively the historical prelude to the Gold Clause Resolution and upheld the power of Congress, based on its constitutional authority over the monetary and currency system, to enact the Resolution and invalidate private contracts for payment in gold or any amount of money indexed to gold. The Court in *Norman* held invalid and unenforceable a gold clause with language identical to that here.[6]

---

**5.** Joint Resolution of June 5, 1933, 31 U.S.C. § 463, provides:

"JOINT RESOLUTION

To assure uniform value to the coins and currencies of the United States.

Whereas the holding of or dealing in gold affect the public interest, and are therefore subject to proper regulation and restriction: and

Whereas the existing emergency has disclosed that provisions of obligations which purport to give the obligee a right to require payment in gold or a particular kind of coin or currency of the United States, or in an amount of money of the United States measured thereby, obstruct the power of the Congress to regulate the value of the money of the United States, and are inconsistent with the declared policy of the Congress to maintain at all times the equal power of every dollar, coined or issued by the United States, in the markets and in the payment of debts. Now, therefore, be it

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled*, That (a) every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby, is declared to be against public policy; and no such provision shall be contained in or made with respect to any obligation hereafter incurred. Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts. Any such provision contained in any law authorizing obligations to be issued by or under authority of the United States, is hereby repealed, but the repeal of any such provision shall not invalidate any other provision or authority contained in such law.

(b) As used in this resolution, the term 'obligation' means an obligation (including every obligation of and to the United States, excepting currency) payable in money of the United States; and the term 'coin or currency' means coin or currency of the United States, including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations.

SEC. 2. The last sentence of paragraph (1) of subsection (b) of section 43 of the Act entitled 'An Act to relieve the existing national economic emergency by increasing agricultural purchasing power, to raise revenue for extraordinary expenses incurred by reason of such emergency, to provide emergency relief with respect to agricultural indebtedness, to provide for the orderly liquidation of joint-stock land banks, and for other purposes', approved May 12, 1933, is amended to read as follows:

'All coins and currencies of the United States (including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations) heretofore or hereafter coined or issued, shall be legal tender for all debts, public and private, public charges, taxes, duties, and dues, except that gold coins, when below the standard weight and limit of tolerance provided by law for the single piece, shall be legal tender only at valuation in proportion to their actual weight.' "

**6.** *Norman v. Baltimore & O. R. R.*, 294 U.S. 240, 293, 55 S.Ct. 407, 79 L.Ed. 885 (1935).

It is clear, therefore, that the gold clause contained in these Great Northern Bonds is invalid and unenforceable if the Gold Clause Resolution is still in effect. The saga, however, does not end there.

## RESTRICTIONS ON PRIVATE GOLD OWNERSHIP AND USE

Subsequent to the Gold Clause Resolution, along with numerous other Depression-era measures designed to reduce the monetary and speculative importance of gold,[7] Congress enacted the Gold Reserve Act of 1934.[8] Section 3 of the Gold Reserve Act, 31 U.S.C. § 442, directed the Secretary of the Treasury, with approval of the President, to promulgate regulations prescribing the conditions under which gold could be acquired and held, for certain permissible uses only, e. g., "industrial, professional, and artistic use." Purchasing, holding, selling or dealing in gold for investment or speculation was specifically forbidden by regulations issued pursuant to Section 3. See, e. g., 31 C.F.R. §§ 54.14(b), 54.15 (1974). Section 4 of the Gold Reserve Act, 31 U.S.C. § 443, provided for forfeiture of any gold held or used in violation of the Act or regulations issued under it, along with certain specified penalties for such violation. This ban on private ownership and use of gold remained in effect for nearly forty years.

## REPEAL OF THE RESTRICTIONS

In 1973 and 1974, Congress enacted what we will refer to as the "Gold Ownership Amendments,"[9] in which the prohibitions on gold ownership were lifted, by repealing Sections 3 and 4 of the Gold Reserve Act, and by further providing that no law, rule, regulation or order "may be construed to prohibit any person from purchasing, holding, selling, or *otherwise dealing with gold in the United States or abroad*" (emphasis added).

The first of the Gold Ownership Amendments, Pub.L. 93–110,[10] was to become effective when the President reported to Congress that "elimination of regulations on private ownership of gold will not adversely affect the United States' international monetary position." The second of the Amendments, Pub.L. 93–373,[11] adopted minor changes in phrasing and provided for automatic effectiveness of the Amendment on December 31, 1974, if the President did not so report before that date. There was no such report, and the Amendment thus became effective December 31, 1974.

7.  *Id.* at 295–97, 55 S.Ct. 407.

8.  Ch. 6, 48 Stat. 337–44 (codified in scattered sections of 31 U.S.C.).

9.  Note 1, *supra.*

10.  Act of September 21, 1973, Pub.L. 93–110, 87 Stat. 352, Tit. I, provides:
    "Sec. 3. (a) Sections 3 and 4 of the Gold Reserve Act of 1934 (31 U.S.C. 442 and 443) are repealed.
    (b) No provision of any law in effect on the date of enactment of this Act, and no rule, regulation or order under authority of any such law, may be construed to prohibit any person from purchasing, holding, selling, or otherwise dealing in gold.
    (c) The provisions of this section, pertaining to gold, shall take effect when the President finds and reports to the Congress that international monetary reform shall have proceeded to the point where elimination of regulations on private ownership of gold will not adversely affect the United States' international monetary position."

11.  Act of August 14, 1974, Pub.L. 93–373, 88 Stat. 445, provides:
    "Sec. 2. Subsections 3(b) and (c) of Public Law 93–110 (87 Stat. 352) are repealed and *in lieu thereof add the following:*
    '(b) No provision of any law in effect on the date of enactment of this Act, and no rule, regulation, or order in effect on the date subsections (a) and (b) become effective may be construed to prohibit any person from purchasing, holding, selling, or otherwise dealing with gold in the United States or abroad.
    '(c) The provisions of subsections (a) and (b) of this section shall take effect either on December 31, 1974, or at any time prior to such date that the President finds and reports to Congress that international monetary reform shall have proceeded to the point where elimination of regulations on private ownership of gold will not adversely affect the United States' international monetary position.'"

## EFFECT OF THE GOLD OWNERSHIP AMENDMENTS ON THE GOLD CLAUSE RESOLUTION

Plaintiffs contend that the Gold Ownership Amendments revive the enforceability of pre-1933 gold clauses since no law, rule, regulation or order may now be construed to prohibit any person from purchasing, holding, selling or otherwise dealing with gold. According to plaintiffs, obligors on pre-1933 bonds containing gold clauses must therefore pay in gold or an amount of money indexed to gold!

■ We conclude, however, that by enacting the Gold Ownership Amendments, thereby permitting a general range of activities and uses of gold as a commodity, Congress did not intend to supplant its earlier Resolution specifically proscribing the use of gold as a medium or measure of payment of contractual obligations.

We note at the outset that there is no explicit repeal, or even mention of the Gold Clause Resolution anywhere in the Gold Ownership Amendments. Yet, Congress did manifest the clearest possible intention to repeal the gold *ownership* provisions of the Gold Reserve Act, using the following specific language: "Sections 3 and 4 of the Gold Reserve Act of 1934 (31 U.S.C. 442 and 443) are repealed." [12] Having adopted such explicit language to repeal one aspect of gold regulation (private ownership of gold), we do not believe Congress intended to repeal yet another aspect (use of gold clauses in contracts) by silence.

■ The question remains, however, whether the declared congressional intention to lift the prohibition against persons "dealing with gold" repeals the Gold Clause Resolution by implication. We conclude that it does not.

■ Repeal by implication is not favored, *Morton v. Mancari*, 417 U.S. 535, 549–50, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 350, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1962); *Wood v. United States*, 41 U.S. (16 Pet.) 342, 363, 10 L.Ed. 987 (1842), and

before finding that an earlier statute is impliedly repealed by a later one, courts insist upon a clear expression of a congressional purpose to do so. As the Supreme Court said in *Morton v. Mancari, supra*:

"The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, *absent a clearly expressed congressional intention to the contrary*, to regard each as effective." 417 U.S. at 551, 94 S.Ct. at 2483 (emphasis added). See also *United States v. Borden Co.*, 308 U.S. 188, 198, 60 S.Ct. 182, 84 L.Ed. 181 (1939).

A later statute will be construed as impliedly repealing an earlier one only in cases of plain repugnancy between them. *Morton v. Mancari, supra*, 417 U.S. at 550, 94 S.Ct. 2474; *Georgia v. Pennsylvania R. R.*, 324 U.S. 439, 456–57, 65 S.Ct. 716, 89 L.Ed. 1051 (1945).

■ We see no basic inconsistency or positive repugnancy in granting persons general permission to purchase, sell, hold or otherwise deal with gold, while denying them the right to demand payment of obligations indexed to a certain value of gold. These statutes thus can coexist.

Standing together, the Gold Ownership Amendments and the Gold Clause Resolution permit the general range of activities incident to ownership of gold as a commodity, while denying the one specific use which has long since been declared against public policy. In addressing just such a situation, the Supreme Court recently reaffirmed another principle of statutory construction, that "a statute dealing with a narrow, precise and specific subject is not submerged by a later-enacted statute covering a more generalized spectrum." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153, 96 S.Ct. 1989, 1992–1993, 48 L.Ed.2d 540 (1976) (citing *Morton v. Mancari, supra*). Viewed in this light, *absent a clear congressional intention* to undercut the dominant congressional purpose of nullifying gold clauses in contractual obligations, we do not con-

---

12. *Id.*

sider the general permission conferred by the Gold Ownership Amendments to have "submerged" the specific prohibition of the Gold Clause Resolution.

Not content to rest on wooden application of these familiar canons of statutory construction, we have searched the legislative history of the Gold Ownership Amendments for an expression of congressional intent respecting the Gold Clause Resolution. We have found only sparse references to the Gold Clause Resolution, none of which manifest an intention to repeal it.

On May 1, 1973, in the Senate hearings considering private ownership of gold,[13] the following brief colloquy took place between Senator Johnston, Chairman of the subcommittee, and Jack F. Bennett, Deputy Under Secretary of the Treasury:

"Senator JOHNSTON. * * * If we permitted the possession of gold, would it make any further difference if we permitted its use for payment of contracts, as legal tender?

Mr. BENNETT. Well, there could be technical difficulties once we permitted private ownership and allowed private trading in gold, and futures trading and so sorth [sic]; there might be technical difficulties in continuing restrictions on the freedom of individuals to contract in gold as they can contract in pork bellies. I think that the question, however, ought to be looked at carefully as to whether some restrictions on indexing dollar contracts in gold should be retained."[14]

Pursuant to Senator Johnston's suggestion, Bennett did consider the question further and wrote to Senator Johnston on May 16, 1973, saying in part:

"Any decision to repeal the Gold Clause Resolution would have to be based on consideration of its effect on our economy. from both a domestic and international viewpoint. Repeal would also have to be reviewed in the light of its effect on the ability of Congress to regulate the value of money of the United States—the original reason for the adoption of the Resolution.

\*　　\*　　\*　　\*　　\*　　\*

Consequently based on these preliminary concerns, repeal of the Gold Clause Resolution should not be undertaken by the Congress without a thorough consideration of all the issues and consequences involved. Since neither the hearings before your Subcommittee nor the debates on other gold legislation pending in the Senate have focused on the gold clause issue, we believe that it would be inadvisable to include the Joint Resolution among the gold laws which are proposed to be repealed by Congress.

\*　　\*　　\*　　\*　　\*　　\*

As we interpret them, the bills now before Congress on private gold ownership, although broadly phrased, are limited to holding and dealing in gold *and do not affect the Gold Clause Joint Resolution.* It would be helpful if the report of your Subcommittee explaining the objectives of these bills made this interpretation explicit through a statement to the effect that the proposed gold legislation would in no way affect the continuing validity of the Joint Resolution of June 5, 1933."[15]

While the committee did not respond to the suggestion that the report explicitly reaffirm the continuing validity of the Gold Clause Resolution, there was no indication anywhere else in the hearings or committee reports that Bennett's interpretation was rejected or even questioned. The matter was not explicitly addressed either way.

Over a year and a half later, on December 4, 1974, Secretary of the Treasury Simon testified before a House subcommittee considering delaying the effective date of the Gold Ownership Amendments:

"Contracts payable alternatively in gold or in an amount of money measured

---

13. Hearings on Private Ownership of Gold Before a Subcomm. of the Senate Comm. on Banking, Housing and Urban Affairs, 93d Cong., 1st Sess. (1973).

14. *Id.* at 54.

15. *Id.* at 55–56.

thereby are both against public policy and unenforceable in our courts under the provisions of the Congressional Gold Clause Joint Resolution of 1933. *This clause continues to apply after the lifting of restrictions on bullion ownership.*" [16]

Here again, there is no indication of congressional rejection of the Secretary's interpretation, or even any discussion of it.

While neither the Deputy Under Secretary's nor the Secretary's interpretation of the Gold Ownership Amendments is binding on us, the fact that the issue was raised and Congress chose to remain silent persuades us that Congress did not manifest the requisite "clear intention" to repeal the Gold Clause Resolution.

Absent some positive expression of a clear intent to repeal the Gold Clause Resolution, we must conclude that it remains in effect. Manifestly, the economic, social and political consequences of repealing the Gold Clause Resolution dictate judicial caution and a more thorough legislative examination and explicit statement indicating an intention to repeal the resolution than we have found in the Gold Ownership Amendments or their histories. [17] In view of the serious consequences noted in the margin, we are especially reluctant to conclude readily that Congress intended that result, where there is nowhere in the legislative history any discussion of these possible consequences, nor any declaration of a congressional purpose to bring about that result.

Furthermore, it is clear to us from our examination of the history that Congress was focusing solely on the Treasury regulations issued under authority of the Gold Reserve Act and was intending only to restore to the public the panoply of activities incident to commodity ownership. The hearings and committee reports on the various gold ownership bills are replete with references to "ownership" and "possession" of gold by private citizens and to the "regulations" then proscribing such use, with no indication of intent to affect the Gold Clause Resolution, nor any discussion of the wisdom of reviving long-dormant gold obligations. [18]

**16.** Hearings on H.R. 17475 Before the Subcomm. on International Finance of the House Comm. on Banking and Currency, 93d Cong., 2d Sess. 7 (1974) (emphasis added).

In addition, several federal agencies with responsibility for monetary and currency affairs, including the Comptroller of the Currency, Federal Deposit Insurance Corporation, Federal Home Loan Bank Board, and the Federal Reserve Bank, have all opined in similar fashion. See 4 CCH Fed.Banking L.Rep. ¶ 56,368 at 35,-222–26 (1974).

**17.** Wholly apart from the propriety of *prospectively* permitting use of gold clauses, we note that there were gold clause obligations representing an estimated $300,000,000 in principal amounts already outstanding at the time the Gold Ownership Amendments became effective. See Business Week, Jan. 12, 1976, at 68. If all of these bonds are to be payable in multiples approximating the instant case (*i. e.*, more than six and one-half times the principal amount), the obligors may be required to pay an aggregate of some $1.95 billion (depending, of course, on the market price of gold at the various maturity dates), or some *$1.65 billion more than the face amounts.*

**18.** For example, the House Committee on Banking and Currency recommended passage of H.R. 6912, the bill that was to become Pub.L. 93–110, with language plainly indicating that the Treasury regulations, and not the Gold Clause Resolution, were the targets of the legislation:

"The Committee view is that while there is nothing wrong in principle with removing the *Treasury gold regulations*, this should not be done at some arbitrary date. . . . In short, the President under this amendment has authority to eliminate the *gold regulations* when he finds that action will be in the best interests of the United States." H.R. Rep.No. 203, reprinted in 2 U.S.Code Cong. & Admin. News 1973, 93d Cong., 1st Sess. pp. 2050, 2062 (emphasis added).

The other committee reports and debates reflect a similar focus. See, *e. g.*, S.Rep.No. 58, 93d Cong., 2d Sess. (1973); S.Rep.No. 78, 93d Cong., 1st Sess. (1973); H.R.Rep.No. 203, 93d Cong., 1st Sess. (1973); H.R.Rep.No. 78, 93d Cong., 1st Sess. (1973); H.R.Conf.Rep.No. 424, 93d Cong., 1st Sess. (1973); H.R.Rep.No. 1142, 93d Cong., 2d Sess. (1974); Hearings on S. 929 Before a Subcomm. of the Senate Comm. on Banking, Housing and Urban Affairs, 93d Cong., 1st Sess. (1973); Hearings on H.R. 13120 Before the House Comm. on Banking and Currency, 92d Cong., 2d Sess. (1972); Hearings on S. 3160, S. 2709, S. 2879, S. 3162 and S.Con.Res. 43 Before the Senate Comm. on

## SUBSEQUENT LEGISLATION

Since the enactment of the Gold Ownership Amendments, numerous measures have been introduced in Congress by the sponsors and drafters of the Amendments, all designed to repeal explicitly the Gold Clause Resolution and restore the right to use gold clauses in obligations. See H.R. 8324, 94th Cong., 1st Sess. (1975) (Rep. Crane); S. 3563, 94th Cong., 2d Sess. (1976) (Sen. Helms); H.R. 14792, 94th Cong., 2d Sess. (1976) (Rep. Conlon); S. 79, 95th Cong., 1st Sess. (1977) (Sen. Helms). Introducing the most recent of these bills in the current session, Senator Helms said:

> "The bill I am introducing today would make the Federal code consistent with the action Congress took in 1974 to legalize gold ownership. Right now, contracts can be made specifying payment in any commodity—*except gold.* In this day and age, such a prohibition is anachronistic." 123 Cong.Rec. at S 280 (daily ed. Jan. 10, 1977) (emphasis added).

Senator Helms suggested that "Congress should remove all doubt about this issue by a simple amendment to the present law." *Id.* at S 281. We note in addition that S. 79 would be prospective in application only and would not revive existing obligations barred by the Gold Clause Resolution.

■ While no one Senator or Representative, or even a group of them, can, by introducing legislation, declare Congress' intent when it enacted prior legislation, the court may take into account a drafter's opinion of the effect of his prior bill. *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 391–92, 394–95, 71 S.Ct. 745, 95 L.Ed. 1035 (1951). Viewed in this light, these attempts to clarify the statutory record support our conclusion that Congress did not address and deal with the Gold Clause Resolution in the Gold Ownership Amendments. If Congress had "clearly intended" to revive gold obligations by enacting the Amendments, "it was strange indeed that [it] omitted the one clear provi-

sion that would have accomplished that result." *Id.* at 392, 71 S.Ct. at 749.

## THE BONDS AS COMMODITY CONTRACTS

Plaintiffs argue further that, since gold is now traded like any other commodity, the gold clause in these bonds should be enforced in the same fashion as, for example, a contract providing for payment in cotton (or any other commodity) on which there would be no restriction whatsoever. We disagree.

■ The bonds do not call for payment of a mere commodity of a certain weight or bulk. They call for payment in "gold coin of the United States", that is, "a particular kind of coin or currency," a coin no longer issued or redeemed by the United States. See Note 4, *supra.* Secondly, while there may be no restrictions on contracts for payment in cotton (or even peanuts), it is clear that gold, of all the commodities, has traditionally possessed a special *monetary* significance. This is a role that Congress specifically addressed and found to be contrary to public policy.

While there may be sentiments to the effect that no public policy objective is *now* being served by the prohibition of gold clauses—see, *e. g.,* the letters of Secretary Simon and Federal Reserve Board Chairman Burns at 123 Cong.Rec.S 282 (daily ed. Jan. 10, 1977)—it is Congress' prerogative, not ours, to find and legislate that the public policy declaration of the Gold Clause Resolution is no longer operative.

■ Accordingly, we conclude that plaintiffs are entitled only to payment of the principal amount of the bonds, dollar for dollar, in legal tender of the United States. Plaintiffs' motion for summary judgment is denied, defendant's motion for summary judgment is granted, and the action is dismissed as to all defendants.

So ordered.

Banking, Housing and Urban Affairs, 92d Cong., 2d Sess. (1972). See also 119 Cong.Rec.

11073–80, 16964–95 (1973) (passim); 120 Cong. Rec. 22006 et seq. (passim).