SOUTHERN CAPITAL CORPORATION,
Appellant,

v.

SOUTHERN PACIFIC COMPANY, Southern Pacific Transportation Company, Morgan Guaranty Trust Company of New York, Appellees.

No. 77–1428.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 18, 1977.

Decided Jan. 11, 1978.

James F. O'Hara, Little Rock, Ark., for appellant; W. P. Hamilton, Little Rock, Ark., on brief.

Robert V. Light, Little Rock, Ark., for appellees and on brief for Southern Pacific Co. and Southern Pacific Trans. Co.; James W. B. Benkard and James L. Kerr, New York City, Alston Jennings and W. J. Williams, Jr., Little Rock, Ark., on brief for Morgan Guaranty Trust Co. of New York.

Before VAN OOSTERHOUT, Senior Circuit Judge, and LAY and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

Southern Capital Corporation is the owner of 175 of Southern Pacific Company's $10,000 bonds due on March 1, 1977. The bonds were issued under and pursuant to a mortgage and deed of trust dated March 1, 1927, between Southern Pacific Company and The National Bank of Commerce in New York, as trustee. Southern Pacific Transportation Company is the successor in interest to Southern Pacific Company. Morgan Guaranty Trust Company of New York is the successor trustee. The bonds contained a "gold clause" which provides for all interest and principal payments to be made "in gold coin of the United States of America of or equal to the standard of weight and fineness existing on March 1, 1927 * * *." On May 28, 1976, appellant Southern Capital brought this action below seeking a declaratory judgment to the effect that the appellees are obligated to satisfy the remaining interest and princi-

pal payments according to the express language of the gold clause in the bonds. Upon the appellees' motion, the district court,[1] in light of 31 U.S.C. § 463, dismissed Southern Capital's complaint for failure to state a claim upon which relief could be granted. Southern Capital appeals from that dismissal. We affirm.

■ The Joint Resolution of June 5, 1933, 31 U.S.C. § 463, was one of a series of congressional measures relating to the currency arising out of a banking and monetary crisis. In the Joint Resolution Congress declared that "gold clauses" were against the public policy. Furthermore, Congress provided that all such obligations "shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts." Shortly after its passage, the Supreme Court upheld the Joint Resolution's constitutionality as to private obligations in Norman v. Baltimore & O. R. R., 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885 (1935).[2] Accord, Holyoke Water Power Co. v. American Writing Paper Co., 300 U.S. 324, 57 S.Ct. 485, 81 L.Ed. 678 (1937). Thus, it would appear that the Joint Resolution bars the relief sought by Southern Capital.

Southern Capital contends, however, that because the economic circumstances that justified the passage of the Joint Resolution no longer exist, the enactment fails of its essential purpose and must fall before the substantive due process requirements of the Fifth Amendment. It cannot be questioned that the Joint Resolution of June 5, 1933, arose out of a banking and monetary crisis. The Supreme Court in Norman v. Baltimore & O. R. R., supra, however, did not rely solely on the economic circumstances of the depression to uphold the constitutionality of the Joint Resolution. The Court instead discussed at some length the power of Congress to establish a uniform monetary sys-

tem as an independent constitutional basis for the Joint Resolution. Several years following the Norman decision, the Supreme Court again in Guaranty Trust Co. v. Henwood, 307 U.S. 247, 259, 59 S.Ct. 847, 853, 83 L.Ed. 1266 (1939), highlighted the congressional power to enact the Joint Resolution when it stated:

> These bonds and their securing mortgage were created subject not only to the exercise by Congress of its constitutional power "to coin money, regulate the value thereof, and of foreign coin," but also to "the full authority of the Congress in relation to the currency." The extent of that authority of Congress has been recently pointed out: "The broad and comprehensive national authority over the subjects of revenue, finance and currency is derived from the aggregate of the powers granted to the Congress, embracing the powers to lay and collect taxes, to borrow money, to regulate commerce with foreign nations and among the several States, to coin money, regulate the value thereof, and of foreign coin, and fix the standards of weights and measures, and the added express power 'to make all laws which shall be necessary and proper for carrying into execution' the other enumerated powers."
>
> Under these powers, Congress was authorized—as it did in the Resolution—to establish, regulate and control the national currency and to make that currency legal tender money for all purposes, including payment of domestic dollar obligations with options for payment in foreign currencies. Whether it was "wise and expedient" to do so was, under the Constitution, a determination to be made by the Congress. [Footnotes omitted.]

We are persuaded that the congressional power to establish a uniform monetary system which existed in 1933 and provided a basis upon which the Supreme Court upheld

1. The Honorable G. Thomas Eisele, United States District Judge for the Eastern District of Arkansas.

2. The Supreme Court upheld the Joint Resolution's constitutionality as to governmental obli-

gations in Nortz v. United States, 294 U.S. 317, 55 S.Ct. 428, 79 L.Ed. 907 (1935), and Perry v. United States, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935).

the constitutionality of the Joint Resolution in 1934 still exists today. Accordingly, we reject Southern Capital's first argument.

■ Southern Capital's remaining arguments center around two congressional enactments in 1973 and 1974 which eliminated limitations on the right of United States citizens to purchase, hold, sell or otherwise deal in gold. It is Southern Capital's position that this legislation has repealed the Joint Resolution. Additionally Southern Capital contends that this legislation is inconsistent with the Joint Resolution and thus causes that enactment to fail of its essential purpose.

In the Act of Sept. 21, 1973, Pub.L.No. 93–110, § 3, 87 Stat. 352, Congress specifically repealed sections 3 and 4 of the Gold Reserve Act of 1934, 31 U.S.C. §§ 442 and 443. We note, however, that neither the Joint Resolution or its codification in 31 U.S.C. § 463 is expressly mentioned. In the

subsequent Act of Aug. 14, 1974, Pub.L.No. 93–373, § 2, 88 Stat. 445, Congress provided that no provisions of any law may be construed to prohibit any person from purchasing, holding, selling or otherwise dealing with gold in the United States or abroad. As it is clear that the Joint Resolution was not expressly repealed by either Act, the question remains whether it was repealed by implication.

In *Morton v. Mancari*, 417 U.S. 535, 550, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974), the Supreme Court stated that "[i]n the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." We are not persuaded in the instant case that Congress intended to repeal the Joint Resolution by the two enactments in 1973 and 1974.[3]

\* \* \* \* \* \*

Consequently based on these preliminary concerns, repeal of the Gold Clause Resolution should not be undertaken by the Congress without a thorough consideration of all the issues and consequences involved. Since neither the hearings before your Subcommittee nor the debates on other gold legislation pending in the Senate have focused on the gold clause issue, we believe that it would be inadvisable to include the Joint Resolution among the gold laws which are proposed to be repealed by Congress.

\* \* \* \* \* \*

As we interpret them, the bills now before Congress on private gold ownership, although broadly phrased, are, limited to holding and dealing in gold *and do not affect the Gold Clause Joint Resolution.* It would be helpful if the report of your Subcommittee explaining the objectives of these bills made this interpretation explicit through a statement to the effect that the proposed gold legislation would in no way affect the continuing validity of the Joint Resolution of June 5, 1933."

While the committee did not respond to the suggestion that the report explicitly reaffirm the continuing validity of the Gold Clause Resolution, there was no indication anywhere else in the hearings or committee reports that Bennett's interpretation was rejected or even questioned. The matter was not explicitly addressed either way.

Over a·year and a half later, on December 4, 1974, Secretary of the Treasury Simon

---

**3.** In *Feldman v. Great Northern Ry.*, 428 F.Supp. 979, 985–86 (S.D.N.Y.1977), the following was stated concerning the legislative history of the enactments of 1973 and 1974:

On May 1, 1973, in the Senate hearings considering private ownership of gold, the following brief colloquy took place between Senator Johnston, Chairman of the subcommittee, and Jack F. Bennett, Deputy Under Secretary of the Treasury:

"Senator JOHNSTON. \* \* \* If we permitted the possession of gold, would it make any further difference if we permitted its use for payment of contracts, as legal tender?

Mr. BENNETT. Well, there could be technical difficulties once we permitted private ownership and allowed private trading in gold, and futures trading and so sorth [sic]; there might be technical difficulties in continuing restrictions on the freedom of individuals to contract in gold as they can contract in pork bellies. I think that the question, however, ought to be looked at carefully as to whether some restrictions on indexing dollar contracts in gold should be retained."

Pursuant to Senator Johnston's suggestion, Bennett did consider the question further and wrote to Senator Johnston on May 16, 1973, saying in part:

"Any decision to repeal the Gold Clause Resolution would have to be based on consideration of its effect on our economy from both a domestic and international viewpoint. Repeal would also have to be reviewed in the light of its effect on the ability of Congress to regulate the value of money of the United States—the original reason for the adoption of the Resolution.

We note that in the Act of Oct. 28, 1977, Pub.L.No.95–147, 91 Stat. 1229, Congress has now specifically made the Joint Resolution nonapplicable to obligations issued on or after October 28, 1977. If Congress had earlier intended to implicitly repeal the Joint Resolution, it is highly doubtful that the Act of October 28, 1977, would have been necessary. Additionally, this recent Act clearly expresses the congressional intent to make the Joint Resolution nonapplicable to obligations issued *on or after* October 28, 1977. We are unable to find an earlier congressional intention to repeal the Joint Resolution.

Furthermore, the Joint Resolution and the two enactments of 1973 and 1974 are not irreconcilable. The Joint Resolution prohibited obligees from demanding payment of obligations in gold. The two latter enactments were concerned with the removal of restrictions imposed on the acquisition, holding and disposition of gold as a commodity. Thus, it appears that the Joint Resolution was not implicitly repealed by the enactments of 1973 and 1974. *Feldman v. Great Northern Ry.*, 428 F.Supp. 979, 984–86 (S.D.N.Y.1977); *Equitable Life Assurance Soc'y of the United States v. Grosvenor*, 426 F.Supp. 67, 71–72 (W.D. Tenn.1976).

We further reject Southern Capital's contention that the 1973 and 1974 legislation is inconsistent with the Joint Resolution. In our view there is no basic inconsistency in granting persons permission to purchase, sell, hold or otherwise deal with gold, while denying them the right to demand payment of obligations indexed to a certain value of gold. The statutes can coexist.

We affirm the district court's dismissal of Southern Capital's complaint for failure to state a claim upon which relief could be granted.

Affirmed.

testified before a House subcommittee considering delaying the effective date of the Gold Ownership Amendments:

"Contracts payable alternatively in gold or in an amount of money measured thereby are both against public policy and unenforceable in our courts under the provisions of the Congressional Gold Clause Joint Resolution of 1933. *This clause continues to apply after the lifting of restrictions on bullion ownership.*"

Here again, there is no indication of congressional rejection of the Secretary's interpretation, or even any discussion of it. [Footnotes omitted.]