HOWARD SCHICKLER *et al.*, Plaintiffs-Appellants, v. SANTA FE SOUTH-
ERN PACIFIC CORPORATION *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—90—0320

Opinion filed May 15, 1992.

Richard S. Schiffrin and Michael D. Craig, both of Schiffrin & Craig, of Chicago, for appellants.

Weston W. Marsh and Thomas J. Healey, both of Atchison, Topeka and Santa Fe Railway Company, of Chicago, for appellees.

JUSTICE GORDON delivered the opinion of the court:

Plaintiffs Howard Schickler and David Noparstak, on behalf of all holders of Atchison, Topeka & Santa Fe Railway Company General Mortgage 4% Gold Bonds Due 1995, brought an action against defendants Santa Fe Southern Pacific Corporation, Atchison, Topeka & Santa Fe Railway Company and Manufacturers Hanover Trust Company as successor trustee under the indenture created at the time of the issuance of the bonds. Count I was an action for breach of contract due to Santa Fe's failure to pay the semi-annual interest due on the bonds in gold coin or its equivalent as required by the terms of the bonds. Count II alleged breach of fiduciary duty by Manufacturers Hanover Trust in allowing the other defendants to make interest payments in cash rather than in gold coin or its equivalent.

Defendants filed a motion to dismiss the complaint pursuant to section 2—615 of the Code of Civil Procedure. (Ill. Rev. Stat. 1989,

ch. 110, par. 2—615.) The defendants' motion was granted, and plaintiffs appeal. For the reasons set forth below, we affirm.

BACKGROUND

By a general mortgage dated December 12, 1895, Atchison, Topeka & Santa Fe Railway Company mortgaged certain of its assets in exchange for long-term general mortgage gold bonds. These bonds mature on October 1, 1995. The terms of the bonds state that the principal "is payable *** in gold coin of the United States, of the present standard of weight and fineness, or its equivalent, and to bear interest at the weight of four per cent. per annum, payable semi-annually in like gold coin."

In 1933, as part of a comprehensive effort to revitalize the economy during the depression, Congress passed a joint resolution which declared gold clauses such as those in the bonds at issue here to be void as against public policy. The joint resolution, commonly and hereinafter referred to as the Abrogation Act (or Act), provided:

"To assure uniform value to the coins and currencies of the United States.

Whereas the holding of or dealing in gold affect the public interest, and are therefore subject to proper regulation and restriction; and

Whereas the existing emergency has disclosed that provisions of obligations which purport to give the obligee a right to require payment in gold or a particular kind of coin or currency of the United States, or in an amount of money of the United States, measured thereby, obstruct the power of the Congress to regulate the value of the money of the United States, and are inconsistent with the declared policy of the Congress to maintain at all times the equal power of every dollar, coined or issued by the United States, in the markets and in the payment of debts. Now, therefore, be it

Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, THAT (a) every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby, is declared to be against public policy; and no such provision shall be contained in or made with respect to any obligation hereafter incurred. Every obligation, hereto-

fore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts. Any such provision contained in any law authorizing obligations to be issued by or under authority of the United States, is hereby repealed, but the repeal of any such provision shall not invalidate any other provision or authority contained in such law.

(b) As used in this resolution, the term 'obligation' means an obligation (including every obligation of and to the United States, excepting currency) payable in money of the United States; and the term 'coin or currency' means coin or currency of the United States, including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations." 48 Stat. 112-13 (1933).

In related legislation, in 1973 and 1974, Congress enacted the "Gold Ownership Amendments," which repealed a 1934 ban on private ownership of gold. In 1977, Congress expressly amended the joint resolution of 1933, by stating that the prohibition against gold clauses would not apply to gold clauses in obligations issued on or after the date of its enactment. 31 U.S.C. §5118(d)(2) (1988) ("An obligation issued containing a gold clause or governed by a gold clause is discharged on payment (dollar for dollar) in United States coin or currency that is legal tender at the time of payment. This paragraph does not apply to an obligation issued after October 27, 1977").

In 1985, Congress passed the "Anti-Apartheid Act of 1985," which authorized the minting of gold coins by the United States government. (31 U.S.C. §5112 (1988).) Although the coins are legal tender at their face value, by statute they may be issued only at their bullion value, which is considerably greater than the face value.

Plaintiffs brought this action in 1989, seeking to permanently enjoin the defendants from making interest or principal payments on the bonds in any form other than gold coin or its equivalent, as well as seeking compensatory damages for defendants' failure to make such payments in the past. Defendants filed a motion to dismiss the complaint, contending that plaintiffs' cause of action was barred by the joint resolution of 1933 which declared void the gold clauses in these bonds. Following briefing and oral argument, the court granted defendants' motion, and this appeal followed.

OPINION

Plaintiffs contend that "dramatic changes" in facts and circumstances since the time of passage of the Abrogation Act have rendered the legislation abrogating gold clauses invalid. Although acknowledging that the Abrogation Act was held to be constitutional in *Norman v. Baltimore & Ohio R.R. Co.* (1935), 294 U.S. 240, 79 L. Ed. 885, 55 S. Ct. 407, it is plaintiffs' position that the circumstances upon which the Supreme Court relied to find the Act valid no longer exist. Plaintiffs argue that the Court based its holding "firmly and exclusively" upon the policy of establishing a uniform currency and parity between kinds of currency, a policy which they contend has been abandoned by the acts of 1973, 1977 and 1985. Therefore, according to the "changed circumstances" principle of statutory construction as set forth in *Chastleton Corp. v. Sinclair* (1924), 264 U.S. 543, 547-48, 68 L. Ed. 841, 843, 44 S. Ct. 405, 406 ("[a] law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed"), plaintiffs urge that we should declare the Abrogation Act invalid and hold defendants liable for breach of contract for their failure to make interest payments in gold or its equivalent.

Defendants respond that the Abrogation Act remains valid and bars plaintiffs' cause of action. According to defendants, the "changed circumstances" principle of *Chastleton* upon which plaintiffs rely applies only to a minority of laws which are themselves constitutional only because temporary circumstances give rise to an enlarged legislative function. In other words, the legislation at issue would be invalid were it not for the special circumstances existing at the time of passage, and if those circumstances change, the law may become prospectively invalid. *Chastleton* is inapplicable, defendants urge, in this instance because the power of Congress to enact the Abrogation Act is grounded in its constitutional power over the monetary system and not based on any circumstances which existed in 1933. We agree with the defendants.

In reaching our conclusion that *Chastleton* is inapplicable here, we first must look to *Block v. Hirsch* (1921), 256 U.S. 135, 65 L. Ed. 865, 41 S. Ct. 458, which considered a 1919 act establishing a commission to control rents in the District of Columbia. The act declared that an emergency existed in the District caused by the influx of people to the District as a result of World War I, and by its own terms was to expire in two years. The Supreme Court held

that the emergency justified the regulation of rents in the District, pursuant to the police power of Congress, so long as the emergency lasted. The validity of exercise of the power to regulate rents arose from the emergency and would not ordinarily constitute a proper exercise of police power. "Plainly, circumstances may so change in time or so differ in space as to clothe with such an interest what at other times or in other places would be a matter of purely private concern." *Block v. Hirsch*, 256 U.S. at 155, 65 L. Ed. at 870, 41 S. Ct. at 459. See also *Home Building & Loan Association v. Blaisdell* (1934), 290 U.S. 398, 78 L. Ed. 413, 54 S. Ct. 231 (mortgage moratorium act, sustained on basis that economic crisis justified suspension of rights of mortgagees, could not validly outlast the emergency).

*Chastleton*, decided three years later in 1924, involved the same rent control commission considered in *Block v. Hirsch*. In *Chastleton*, the Court considered a 1922 act which declared that the emergency still existed and reenacted the 1919 act. Although holding that a declaration by Congress relating to the existence of an emergency is entitled to great respect, citing *Block v. Hirsch*, the Court nevertheless remanded the case for a determination as to whether the exigency still existed upon which the continued operation of the law depended. The Court stated that "[a] law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed." (*Chastleton Corp. v. Sinclair*, 264 U.S. at 547-48, 68 L. Ed. at 843, 44 S. Ct. at 406.) When read in light of *Block v. Hirsch*, it is apparent that the *Chastleton* Court was referring to the power of the legislature to enact the statute in question which may cease to operate if the facts or circumstances change. See also *Daly v. County of Madison* (1941), 378 Ill. 357, 369, 38 N.E.2d 160 (discussing *Chastleton*, the court said "[t]he case was disposed of on the sole ground that there was no power to adopt or enforce the order, except to meet an existing emergency. The existence of the emergency was the source of the power. *** The power existed only in the emergency, and when the emergency ceased to exist the power likewise ceased").

The relevant questions, therefore, are whether the power of the legislature to enact the Abrogation Act was dependent for its validity upon a particular set of facts or circumstances existing at the time of its passage, and if so, whether those facts or circumstances have changed so as to render the Act invalid. As discussed below,

we answer the first question in the negative. As a result, we do not reach the second.

Although the Abrogation Act was passed during the crisis of the Great Depression, the Court in *Norman v. Baltimore & Ohio R.R. Co.* did not uphold the Act as an exercise of power dependent upon the economic circumstances which precipitated its passage. Rather, it found the Act to be a legitimate exercise of Congress' constitutional power over the monetary system of the country. In reaching this conclusion, the Court first noted that Congress possessed a "broad and comprehensive national authority over the subjects of revenue, finance and currency *** derived from the aggregate of the powers granted to the Congress." (*Norman*, 294 U.S. at 303, 79 L. Ed. at 900, 55 S. Ct. at 414; U.S. Const., art. I, §8, cl. 5.) The Court went on to establish the power of Congress to invalidate the provisions of existing contracts which interfere with the exercise of its constitutional authority. (*Norman*, 294 U.S. at 306-11, 79 L. Ed. at 901-04, 55 S. Ct. at 415-17.) Finally, the Court determined that the gold clauses did constitute an actual interference with the monetary policy established by Congress. "We are concerned with the constitutional power of the Congress over the monetary system of the country and its attempted frustration." *Norman*, 294 U.S. at 316, 79 L. Ed. at 906, 55 S. Ct. at 419. See also *Feldman v. Great Northern Ry. Co.* (S.D.N.Y. 1977), 428 F. Supp. 979, 982 (*Norman* Court "upheld the power of Congress, based on its constitutional authority over the monetary and currency system, to enact the Resolution and invalidate private contracts for payment in gold or any amount of money indexed to gold").

It cannot be questioned that circumstances have changed since the Abrogation Act was enacted in 1933. We are no longer in the midst of a great depression. However, as discussed above, the Act was upheld in *Norman* based upon Congress' power to regulate currency and to adopt a uniform currency as granted by the Constitution, a power which exists today just as it did in 1933. See *Southern Capital Corp. v. Southern Pacific Co.* (8th Cir. 1978), 568 F.2d 590, 591-92 ("[w]e are persuaded that the congressional power to establish a uniform monetary system which existed in 1933 and provided a basis upon which the Supreme Court upheld the constitutionality of the Joint Resolution in 1934 still exists today").

The "changed circumstances" upon which plaintiffs base their arguments are actually changes in policy evidenced by subsequent acts of Congress, and not changes in facts upon which the validity of the Abrogation Act is dependent. Plaintiffs contend that the

"Gold Ownership Amendments" of 1973 and 1974 represent a "major departure (*i.e.*, change in facts) from the circumstances and policies existing during the 1930s regarding gold ownership." In addition, they contend that the 1977 act, declaring gold clauses entered into after October 28, 1977, to be enforceable, indicates that "there is, in fact, no public policy against such clauses any longer." (See *Fay Corp. v. BAT Holdings I, Inc.* (W.D. Wash. 1986), 646 F. Supp. 946, *aff'd sub nom. Fay Corp. v. Frederick & Nelson Seattle, Inc.* (9th Cir. 1990), 896 F.2d 1227 (1982 novation of lease created new contract rendering gold clause in lease which was otherwise invalid under 1933 act, revived and enforceable).) Moreover, plaintiffs contend that the 1977 amendment represented a major step toward complete abandonment of the policy favoring parity of currency. Finally, plaintiffs argue, the 1985 acts providing for the minting of gold coins which are legal tender at their face value demonstrate that "there is no possible logical argument for the proposition that there is a policy of uniformity or parity of the currency."

While each of the acts plaintiffs rely upon may indeed indicate a change in prospective monetary policy, they are not dispositive of our determination of the continuing validity of the Abrogation Act as it relates to the enforceability of the preexistent gold clauses in question. We are in accord with the statement made by another court in another challenge to the Abrogation Act: "While there may be sentiments to the effect that no public policy objective is *now* being served by the prohibition of gold clauses *** it is Congress' prerogative, not ours, to find and legislate that the public policy declaration of the Gold Clause Resolution is no longer operative." (Emphasis in original.) (*Feldman v. Great Northern Ry. Co.*, 428 F. Supp. at 987.) "The question before the Court is one of power, not policy." (*Norman*, 294 U.S. at 297, 79 L. Ed. at 897, 55 S. Ct. at 411.) To find the statute invalid, it must be shown that the law "is so destitute of basis or so arbitrary or capricious as to place the legislation and the regulations beyond the constitutional authority of Congress over the monetary system of the United States." (*Laycock v. Kenney* (9th Cir. 1959), 270 F.2d 580, 592.) As shall be discussed below, this has not been demonstrated or even argued by the plaintiffs in this cause. See *United States v. Carolene Products Co.* (1938), 304 U.S. 144, 82 L. Ed. 1234, 58 S. Ct. 778, and *Milnot Co. v. Richardson* (S.D. Ill. 1972), 350 F. Supp. 221, discussed below, wherein statutes were challenged as lacking a rational basis.

Defendants contend that the "changed circumstance" argument made by plaintiffs here is indistinguishable from an "implied re-

peal" argument, an argument which has been consistently rejected by the courts in regard to the Abrogation Act. (See, *e.g., Southern Capital Corp. v. Southern Pacific Co.*, 568 F.2d 590; *Feldman v. Great Northern Ry. Co.*, 428 F. Supp. 979; *Gold Bondholder's Protective Council v. Atchison, Topeka & Santa Fe Ry. Co.* (Alaska 1982), 649 P.2d 947.) "[A]n implied repeal results when a statute is enacted which cannot be harmonized with the terms and effect of an earlier act. In these situations, the later expression will prevail since it cannot be presumed that the legislature intended to enact laws which are contradictory." (*In re Marriage of Burke* (1989), 185 Ill. App. 3d 253, 258, 541 N.E.2d 245.) We agree that an implied repeal argument cannot prevail based on the cases cited above and on the fact that the 1977 amendment, which was the only act to provide for payment of obligations indexed to a certain value of gold, was explicitly made prospective only, a fact in no way inconsistent with the continued enforcement of the Abrogation Act as it applies to obligations issued prior to October 27, 1977.

Plaintiffs contend that their argument is not one of implied repeal and that the trial court erroneously interpreted it as such in dismissing their complaint. Concomitantly, they urge, the Alaska case of *Gold Bondholders Protective Council v. Atchison, Topeka & Santa Fe Ry. Co.*, upon which the trial court relied, is inapplicable since it relied solely upon a theory of implied repeal and did not base its conclusion upon *Chastleton's* changed circumstance theory. In connection with this latter point, we note, however, that while the Alaska case did not cite to *Chastleton,* it nevertheless purported to "reconsider the validity of the statute in light of conditions which now exist" (*Gold Bondholder's Protective Council,* 649 P.2d at 950), which would seem to be essentially the argument made by plaintiffs here. Further, among the factors which the court considered were the 1973 and 1974 statutes which permitted the private ownership of gold and the 1977 amendment which removed the prohibition against gold clauses in obligations issued after October 27, 1977, the same factors to which plaintiffs direct our attention. As a result, although we agree with plaintiffs that *Gold Bondholder's Protective Council* is not binding on this court, we do not agree that it is totally irrelevant.

The remaining authorities cited by the plaintiffs in support of their "changed circumstances" argument are not sufficiently in point. As previously noted, in *United States v. Carolene Products Co.* and *Milnot Co. v. Richardson* the issue was whether a statute regulating interstate shipment of filled milk was unconstitutional

under a "rational basis" test. In *Carolene Products*, the Court, citing *Chastleton*, acknowledged that

> "the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist. [Citation.] Similarly we recognize that the constitutionality of a statute, valid on its face, may be assailed by proof of facts tending to show that the statute as applied to a particular article is without support in reason because the article, although within the prohibited class, is so different from others of the class as to be without the reason for the prohibition." (*United States v. Carolene Products Co.*, 304 U.S. at 153-54, 82 L. Ed. at 1242, 58 S. Ct. at 784.)

It went on, however, to hold the statute constitutional, finding the statute not to be "without support in reason," stating "[b]ut by their very nature such inquiries, where the legislative judgment is drawn in question, must be restricted to the issue whether any state of facts either known or which could reasonably be assumed affords support for it." *United States v. Carolene Products Co.*, 304 U.S. at 154, 82 L. Ed. at 1243, 58 S. Ct. at 784.

Thirty-four years later, in *Milnot Co.*, the Court, relying on the "changed circumstances" principle of *Chastleton*, held that due to the proliferation of products similar to Milnot's which were not regulated by the Act and changes in the dairy market over the years, application of the Filled Milk Act to Milnot no longer rested upon any rational basis and was therefore unconstitutional.

Here, as we have noted earlier, plaintiffs have not established or for that matter argued that the Abrogation Act lacks a rational basis and is therefore unconstitutional. Instead, our attention is directed to alleged changes in monetary policy, arguments properly directed to the legislature rather than the courts. A change in prospective policy will not by itself provide a basis for the judicial invalidation of an earlier law, so long as there is a rational basis for its continued enforcement. Clearly, the potential economic impact that would result from reviving gold clauses previously abrogated in 1933 would on its face provide a rational basis for application of the Abrogation Act retrospectively to gold clauses in existence prior to 1977. See *Feldman v. Great Northern Ry. Co.*, 428 F. Supp. at 985 (in letter from Deputy Under Secretary of the Treasury to the Senate regarding repeal of the gold clause resolution, it was stated "any decision to repeal the Gold Clause Resolution would have to

be based on consideration of its effect on our economy from both a domestic and international viewpoint").

The only case cited by plaintiffs which appears to rely on *Chastleton* to hold an ordinance invalid and contrary to public policy due to changes in policy in a nonemergency situation is *Fieldcrest Dairies, Inc. v. City of Chicago* (7th Cir. 1941), 122 F.2d 132, *vacated on jurisdictional grounds* (1942), 316 U.S. 168, 86 L. Ed. 1355, 62 S. Ct. 986. There the court noted that ordinarily repeal or modification of existing legislation due to changed conditions is a function for the legislature, not the courts. "Changed conditions, of course, may make advisable a repeal or modification of existing legislation, but if so, the appeal should be to the legislature and not the courts." (*Fieldcrest Dairies*, 122 F.2d at 135-36.) The invalidation was based on the fact that during the pendency of the appeal there was an overt articulation of policy by the State legislature which directly conflicted with the municipal ordinance.

No such express statement of public policy exists in this case. As discussed above, the 1977 amendment, validating gold clauses prospectively only, may be viewed as an expression of policy that pre-1977 gold clauses should remain unenforceable. Had Congress intended to repeal the Abrogation Act and to revive those gold clauses which had clearly been invalidated by the Act, it could have done so, but did not. "If Congress had 'clearly intended' to revive gold obligations by enacting the [1977] Amendments, 'it was strange indeed that [it] omitted the one clear provision that would have accomplished that result.'" *Feldman v. Great Northern Ry. Co.*, 428 F. Supp. at 987, quoting *Schwegmann Brothers v. Calvert Distillers Corp.* (1951), 341 U.S. 384, 391-92, 95 L. Ed. 1035, 1046, 71 S. Ct. 745, 749.

Our conclusion that the Abrogation Act bars enforcement of the gold clauses in question here finds further support in the fact that every other court which has considered the question has reached the same result as we do here, although in each of these other cases plaintiffs' arguments were framed in terms of "implied repeal." See *Rudolph v. Steinhardt* (11th Cir. 1983), 721 F.2d 1324 (gold "devaluation" clause in lease entered into in 1970 not enforceable, 1977 amendment did not render clause enforceable as to payments due after that date); *Southern Capital Corp. v. Southern Pacific Co.*, 568 F.2d 590 (Abrogation Act not impliedly repealed by 1973 and 1974 acts); *Feldman v. Great Northern Ry. Co.*, 428 F. Supp. 979 (1973 and 1974 gold ownership amendments did not impliedly repeal Abrogation Act); *Equitable Life Assurance Society v.*

*Grosvener* (W.D. Tenn. 1976), 426 F. Supp. 67 (1974 act removing restriction on gold ownership did not repeal, explicitly or implicitly, act of 1933); *Radue v. Zanaty* (1975), 293 Ala. 585, 308 So. 2d 242 (gold clause on check unenforceable); *Gold Bondholders Protective Council v. Atchison, Topeka & Santa Fe Ry. Co.*, 649 P.2d 947 (no implied repeal by 1973, 1974 or 1977 amendment); *Henderson v. Mann Theatres Corp.* (1976), 65 Cal. App. 3d 397, 135 Cal. Rptr. 266 (gold clause in lease rendered unenforceable by 1933 act, not revived by 1973 act, rejecting express or implied repeal argument).

Accordingly, for all the above reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McNULTY, P.J., and MURRAY, J., concur.