## HOLYOKE WATER POWER CO. v. AMERICAN WRITING PAPER CO., Inc.

### No. 3062.

Circuit Court of Appeals, First Circuit.

April 15, 1936.

Bentley W. Warren, of Boston, Mass. (Nathan P. Avery, James M. Healy, and Avery, Healy & Button, all of Holyoke, Mass., and Donald C. Starr and Warren, Garfield, Whiteside & Lamson, all of Boston, Mass., on the brief), for appellant.

Charles P. Curtis, Jr., of Boston, Mass. (John L. Hall and Claude R. Branch, both of Boston, Mass., and Russell L. Davenport, of Holyoke, Mass., on the brief), for appellee.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

WILSON, Circuit Judge.

The appellee seeks to reorganize under section 77B of the Bankruptcy Act (11 U. S.C.A. § 207). The appellant filed a petition in the bankruptcy court as an intervening creditor to determine the amount of a claim of the petitioner for rentals under perpetual leases by it to appellee's predecessors in title of thirteen water power rights on the Connecticut river at Holyoke, Mass., entered into between 1880 and 1898 pursuant to certain proposals of sale which were incorporated in the leases.

In 1859 the Holyoke Water Company acquired the water power privileges on the Connecticut river at Holyoke, which it divided up into units of 16 hour mill powers. Of these units 27 with mill sites were acquired by the appellee by mesne conveyances from the grantees of the appellant. The provisions of 14 of these leases entered into prior to 1880 were under construction by this court in 68 F.(2d) 261, in which the rental per unit was payable in silver bullion of 260 ounces, troy weight, of the present standard of weight and fineness of the silver coin of the United States, or an equivalent in gold at the option of the grantee at the time of payment.

In the 13 indentures entered into after 1880, the rentals were made payable in a quantity of gold equal in amount to ——— dollars of gold coin of the current standard of weight and fineness, or its equivalent in currency of the United States.

The District Court held that, if gold had been delivered to the petitioner in payment of the rentals under the indentures, it could not have received therefor, under the order of the Secretary of the Treasury issued on January 15, 1934, more than $20.67 per ounce of pure gold, and issued a decree ordering that the petitioner's claim be established by multiplying the total number of ounces of pure gold included in the payments due July 1, 1934, October 1, 1934, and January 1, 1935, by $20.67 per ounce. From this decree the petitioner appealed.

While the petitioner has 25 assignments of error, they raise only a single issue, viz.: What measure is to be applied in determining the equivalent in currency of the quantity of gold called for by the indentures in payment of the rentals on July 1, 1934, October 1, 1934, and January 1, 1935?

The parties have selected the indenture entered into on March 1, 1895, as typical of the other 12 indentures, which together form the basis of the petitioner's claim, and which provides for the payment of rental as follows:

"A quantity of gold which shall be equal to $1500 of the gold coin of the United

States of the standard of weight and fineness of the year 1894, or the equivalent of this commodity in United States currency."

Counsel for the appellee urges that this is not a commodity contract. It, however, calls for the payment of "a quantity of gold" of an amount equal to the gold content of $1,500 of gold coins, or "the equivalent of this commodity in United States currency."

In other words, in the indenture dated March 1, 1895, the appellee agreed to pay annually for each unit of power, either 80.-625 ounces, troy weight, of gold, nine-tenths fine, being equal in amount to $1,500 of gold coin of the weight and fineness of gold coin of 1894, or the equivalent of this amount of gold in United States currency, which must mean in United States currency at the date of payment.

That other years than 1894 were selected in the earlier indentures involved to determine the weight and fineness of the gold coin fixed as a measure of the quantity of gold to be used in payment of the rental is immaterial, since the weight and fineness of the gold in the dollar, the basic unit of United States currency, remained the same during the entire period covered by these indentures, section 3511, Rev.St. section 1, chap. 41, Act March 14, 1900 (31 Stat. 45 [31 U.S.C.A. § 314]), until the weight was changed by Presidential Proclamation on January 31, 1934 (31 U.S.C.A. § 821 note).

The amount of the petitioner's claim must be determined in view of the following proclamations by the President and Secretary of the Treasury and Acts of Congress: On March 6, 1933, the President, stating that there had been a heavy withdrawal of gold and currency from our banking institutions for the purpose of hoarding and extensive speculative activity abroad in foreign exchange, which had resulted in severe drains on the nation's stocks of gold, declared a bank holiday until March 9, 1933 (see 12 U.S.C.A. § 95 note). On that day the Secretary of the Treasury, with the President's approval, issued instructions to the Treasurer of the United States to make payments in gold in any form only under license issued by the Secretary.

On March 9, 1933, the President approved the Emergency Banking Relief Act (48 Stat. 1). This act (section 3, 12 U.S.C.A. § 248(n) amended section 11 of the Federal Reserve Act (38 Stat. 261, 39 Stat. 752) and authorized the Secretary of the Treasury to require all persons to deliver to the Treasurer of the United States all gold coin, gold bullion, and gold certificates owned by them, and that the Secretary should pay therefor an equivalent amount of any other form of coin or currency coined or issued under the laws of the United States.

By Executive Order of April 5, 1933, No. 6102 (12 U.S.C.A. § 248 note), forbidding hoarding of gold, all persons were required to deliver on or before May 1, 1933, to stated banks, all gold coin, gold bullion, and gold certificates, the holder to receive an equivalent amount of any other form of coin or currency coined or issued under the laws of the United States.

By section 43 of the Act of May 12, 1933 (48 Stat. 51 [see 31 U.S.C.A. § 821]) it was provided that the President should have authority, upon the making of prescribed findings and in the circumstances stated, "to fix the weight of the gold dollar in grains nine tenths fine * * * at such amounts as he finds necessary from his investigation to stabilize domestic prices or to protect the foreign commerce against the adverse effect of depreciated foreign currencies"; and it was further provided that the gold dollar, the weight of which is so fixed, shall be the standard unit of value, and that all forms of money shall be maintained at a parity with this standard, but that "in no event shall the weight of the gold dollar be fixed so as to reduce its present weight by more than 50 per centum."

Congress then passed the Joint Resolution of June 5, 1933 (48 Stat. 113) which provided as follows:

"Every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby, is declared to be against public policy; and no such provision shall be contained in or made with respect to any obligation hereafter incurred. Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public or private debts. * * '*. As used in this resolution, the term 'obligation' means an obligation (including every obligation of and to the United States, excepting currency) payable in money of the United States; and the term 'coin or currency' means coin or currency

of the United States, including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations;" Section 1 (31 U.S.C.A. § 463).

On December 28, 1933, the Secretary of the Treasury, pursuant to the Act of March 9, 1933, ordered every person within the jurisdiction of the United States to deliver to the Treasurer of the United States all gold coin, gold bullion, and gold certificates then held by him, for which the Treasurer agreed to pay the then equivalent of gold coin or bullion, or $20.67 per ounce of pure gold, which price was based on the then gold content of the dollar.

On January 15, 1934, the Secretary of the Treasury by proclamation fixed January 17 as the last day for the delivery of gold under the order of December 28, 1933, in which he agreed to pay for pure gold held in noncompliance with the order of December 28, 1933, and delivered thereafter, the sum of $20.67 per ounce, but with the reservation that there be paid for such gold "only such part or none of the amount" thus fixed, as the Secretary shall from time to time prescribe.

Then followed the Gold Reserve Act of January 30, 1934, § 15 (31 U.S.C.A. § 444) of which provided that:

"Wherever reference is made in this Act [sections 315b, 408a, 408b, 441 to 426, 821 and 822a of this title], to equivalents as between dollars or currency of the United States and gold, one dollar or one dollar face amount of any currency of the United States equals such a number of grains of gold, nine tenths fine, as, at the time referred to, are contained in the standard unit of value, that is, so long as the President shall not have altered by proclamation the weight of the gold dollar [see section 3511, Rev.St. section 1, chap. 41, 31 Stat. 45, 31 U.S.C.A. § 314] under the authority of section 43, title III, of the Act approved May 12, 1933, as heretofore and by this Act amended [section 821 of this title], twenty-five and eight tenths grains of gold, nine tenths fine, and thereafter such a number of grains of gold, nine tenths fine, as the President shall have fixed under such authority."

Up to this time the equivalent of the quantity of gold provided for to be paid as rental in the indenture here under consideration was $1,500 in gold dollars of 25.8 grains, nine-tenths fine, or its equivalent in currency.

On the thirty-first day of January, 1934, the President issued a proclamation by which the content of the gold dollar was reduced so that thereafter it should contain only 15⁵⁄₂₁ grains of gold, nine-tenths fine, instead of 25.8 grains as formerly, so that from and after January 31, 1934, the equivalent of an ounce of pure gold measured in terms of the new gold dollar was $35 per ounce instead of $20.67 prior to January 31, 1934.

The question then is: The first option open to appellee to pay the rental in a quantity of gold equal to $1,500 of gold coin of the standard weight and fineness of gold coin of the year 1894 having been rendered impossible of performance by executive orders, the Joint Resolution of June 5, 1933, and the orders of the Secretary of the Treasury on December 28, 1933, and January 15, 1934, and the gold dollar, the standard unit of value of United States currency, having been devalued on January 31, 1934, by order of the President under the authority vested in him by the Act of May 12, 1933, and the Gold Reserve Act of January 30, 1934, what was the equivalent of a quantity of gold equal to $1500 of gold coin of the standard weight and fineness in 1894 in currency of the United States after January 31, 1934, when the rentals under these indentures became due?

Unless the Joint Resolution of June 5, 1933, applies to these indentures, we think the equivalent in currency of the quantity of gold named in these indentures for rentals would have to be determined in the devaluated dollar of 15⁵⁄₂₁ grains, which in the indenture under consideration would be $2539.69 at the rate of $31.50 per ounce for 80.625 ounces, nine-tenths fine.

The judge of the District Court in these proceedings following a prior decision in the District Court in relation to rentals due prior to January 21, 1934, 9 F.Supp. 451, held that the Joint Resolution of June 5, 1933, was not applicable to the provision in these indentures.

Counsel for the appellant contends that this ruling of the District Court is not open to the appellee to contest before this court, since it did not appeal from the ruling of the District Court; but we think it is open to the appellee to urge matter appearing in the record in support of the judgment of the District Court, though his argument may involve an attack upon the reasoning of the lower court, or an insistence upon a matter overlooked or ignored by it. United

States v. American Railway Express Co., 265 U.S. 425, 435, 44 S.Ct. 560, 68 L.Ed. 1087; Union Tool Co. v. Wilson, 259 U.S. 107, 111, 42 S.Ct. 427, 66 L.Ed. 848.

The Joint Resolution of June 5, 1933, did not affect the amount due as rentals prior to January 31, 1934, because the standard unit of value had not been changed, and did not originally in express terms apply to the provisions in these indentures, since it only applied where the obligee had the option, or right, to require payment in gold, or in a particular kind of coin or currency, or in an amount of money of the United States measured thereby. Prior to the passage of the Resolution, the option to pay the rentals in a quantity of gold equal to $1,500 of gold coin or in the equivalent of this amount in currency was not in the obligee or petitioner, but rested with the obligor.

However, by the Acts of Congress and the proclamations of the President and Secretary of the Treasury above referred to, the option to discharge the obligation of the rentals by tendering the quantity of gold named in the indentures was no longer open to the obligor, thus eliminating from the indentures any option as to method of payment. The effect was to give the petitioner and obligee the right to demand the equivalent in currency of $1,500 in gold coin in payment, Restatement of the Law of Contracts (Am.Law Inst.) § 469, and the obligor the right to discharge his obligation by tendering the equivalent in currency of the number of dollars in gold coin named in the rental provisions, which brought these indentures within the purview of the Joint Resolution.

The Supreme Court in Norman v. Baltimore & Ohio R. Co., 294 U.S. 240, at page 314, 55 S.Ct. 407, 418, 79 L.Ed. 885, 95 A.L.R. 1352, referring to the provision in the bonds of the defendant to pay the principal amount and coupons due February 1, 1934, in gold coin of the weight and fineness, in one instance of February 1, 1930, and in two other cases of May 1, 1903, said that "if the clauses are treated as 'gold value' clauses, that is, as intended to set up a measure or standard of value if gold coin is not available, we think they are still hostile to the policy of the Congress, and hence subject to prohibition," obviously referring to the prohibition contained in the Joint Resolution. Therefore, while the indentures involved here originally were contracts for the payment of gold as a commodity measured in gold dollars, by the Acts of Congress and the proclamations of the President and the Secretary of the Treasury above referred to, they have become contracts for the payment of money measured in terms of gold and so are also hostile to the policy of Congress.

In other words, the provisions as to rentals in these indentures by reason of the exclusion of gold for monetary use have become gold value clauses within the meaning of the decisions in Norman v. Baltimore & Ohio R. Co., 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352, and Nortz v. United States, 294 U.S. 317, 55 S.Ct. 428, 79 L.Ed. 907, 95 A.L.R. 1346; and the rentals measured in terms of dollars, viz., $1,500 of gold coin of the United States of the weight and fineness of the coinage of 1894 became, under the Joint Resolution, dischargeable dollar for dollar in any currency which was legal tender when they became due.

As Mr. Justice Stone said in his concurring opinion in Perry v. United States, 294 U.S. 330, at page 360, 55 S.Ct. 432, 439, 79 L.Ed. 912, 95 A.L.R. 1335: "It is the prohibition, by the Joint Resolution of Congress, of payment of the increased number of depreciated dollars required to make up the full equivalent, which alone bars recovery."

We do not think the case is to be decided on the basis of damages for a breach of the contract to pay the rentals by a delivery of a quantity of gold. That has become impossible by an Act of Congress within its constitutional powers, see Nortz v. United States, supra, 294 U.S. 317, at page 328, 55 S.Ct. 428, 79 L.Ed. 907, 95 A.L.R. 1346, and the appellee is not responsible for any default in this respect. These proceedings are for the purpose of ascertaining the amount due as an equivalent in currency, the payment of which would be in full discharge of the obligation.

Nor do we think the amount due is measured by the market price of gold in London; or what could be obtained for certain kinds of gold at the United States Mint, or what the Secretary of the Treasury might determine he would pay for gold illegally held and delivered after January 17, 1934. Payment in gold is excluded from consideration. The appellee could not obtain the gold, nor could it use it for monetary purposes. It cannot be fairly said that on July 1, 1934, there was any market price for gold in this country except the several kinds enumerat-

ed in the proclamation of the Secretary, none of which can be used for monetary purposes to discharge an obligation of this kind. The sum of $20.67 per ounce, which the Secretary continued to pay, if he did, after January 17, 1934, was not a continuing offer, but one which he might withdraw or reduce at any time.

■ It is suggested that the Joint Resolution, if applied to this case, is unconstitutional. The Supreme Court held that the basis for its constitutionality is the power vested in Congress to regulate the coinage and value of money. Since the gold clauses in corporate bonds are of so common occurrence and involve such large amounts as to seriously interfere with the regulation of the currency of the United States, these contracts in corporate bonds to pay in gold must yield to this constitutional power of Congress.

But it is urged that provisions of the kind found in these indentures are so uncommon that they cannot be held to interfere with the constitutional power vested in Congress to regulate the currency, and, therefore, the Joint Resolution, if applied here, deprives the appellant of its property without due process and is beyond the power of Congress.

While such contracts may interfere with the constitutional power to regulate currency in a much lesser degree than the gold clause in corporate bonds or in gold certificates, the degree is not controlling. The extent of the interference is not for this court to determine. If Congress has determined that there is in fact interference with its constitutional powers, any contract causing such interference must yield to congressional authority.

The court said in Norman v. Baltimore & Ohio R. Co., supra, 294 U.S. 240, at page 311, 55 S.Ct. 407, 417, 79 L.Ed. 885, 95 A. L.R. 1352:

"That point is whether the gold clauses do constitute an actual interference with the monetary policy of the Congress in the light of its broad power to determine that policy. Whether they may be deemed to be such an interference depends upon an appraisement of economic conditions and upon determinations of questions of fact. With respect to those conditions and determinations, the Congress is entitled to its own judgment. We may inquire whether its action is arbitrary or capricious, that is, whether it has reasonable relation to a legitimate end. If it is an appropriate means to such an end, the decisions of the Congress as to the degree of the necessity for the adoption of that means, is final."

The Joint Resolution (48 Stat. 112) recites the determination of Congress as follows:

"Whereas the existing emergency has disclosed that provisions of obligations which purport to give the obligee a right to require payment in gold or a particular kind of coin or currency of the United States, or in an amount in money of the United States measured thereby, obstruct the power of the Congress to regulate the value of the money of the United States, and are inconsistent with the declared policy of the Congress to maintain at all times the equal power of every dollar, coined or issued by the United States, in the markets and in the payment of debts."

Congress has made no exception of unusual contracts, such as these indentures, which alone may have only slight effect on the constitutional power to regulate the currency of the country. This court can make none because of the lesser degree by which these indentures restrict that power, especially under the emergency found by Congress in 1933. Congress having declared in the Joint Resolution that all obligations heretofore or hereafter incurred that are measured in terms of gold are prohibited, and are payable dollar for dollar in any currency which is legal tender at the time of payment, we think these indentures come within the intent of the Resolution. If hardships follow, they must be borne. With the wisdom of such a policy the courts are not concerned.

It is true that if, under the typical indenture under consideration here, the petitioner was paid 80.625 ounces of gold, nine tenths fine, in gold dollars containing only 15⅝₁ grains of gold, nine-tenths fine, the equivalent in currency would be approximately $2,539.69, while if the obligation were discharged dollar for dollar, it would receive only $1,500 in the depreciated currency, which, by the way, is the same amount it would receive for 80.625 ounces of gold measured in gold dollars of 25.8 grains, nine-tenths fine, or in currency based on the same standard.

Undoubtedly the draftsman of these indentures sought to stabilize the amount the petitioner would receive as rental, regardless of the fluctuation in the currency, but if by so doing the indentures in such an emergency as existed in 1933 added in some

404

degree to the interference by gold clauses in other obligations with the constitutional power of Congress to regulate the currency, the petitioner must accept any action of Congress with that end in view.

The petitioner can pay its taxes, workmen, for materials and interest on its obligations and all other expenses in the same currency it receives, which is legal tender for all public or private debts. It does not have to pay out currency based on a standard unit of value containing 25.8 grains of gold and receive currency based on a unit of value containing 15$\frac{5}{21}$ grains of gold. It receives and pays out currency based on the same standard, viz., a gold dollar containing 15$\frac{5}{21}$ grains of gold, nine-tenths fine. Except in so far as the prices of labor and materials may have been increased by the devaluation of the dollar, it suffers no hardship. The prices of labor and materials are always subject to fluctuation without any change in the standard unit of value of the currency.

Nor is the appellant the only one affected by a change in the standard unit of our currency. Every person whose income is derived from a stated salary, or wage, or is derived from interest on bonds, or dividends on stocks, may be affected in the same way, though not to the same extent.

In view of the intent of the government as expressed in the several executive orders and proclamations of the President and Secretary of the Treasury, the Joint Resolution and Acts of Congress above referred to, we think the rentals in these indentures may be discharged by the payment, dollar for dollar, of the amount which the quantity of gold named therein equals in gold coin of the weight and fineness of the years specified in each indenture, or in the indenture of March 1, 1895, by the payment of $1,500 in any currency which was legal tender for public or private debts on the due dates of the rentals.

Since we arrive at the same result as to the amount of the petitioner's claim as the District Court, the proper deductions being agreed upon, the mandate may be:

The decree of the District Court is affirmed as to the amount of the petitioner's claim, with costs of this court to the appellee.

MORTON, Circuit Judge, concurs on the ground that the case is within the scope of the decisions and opinions in the Gold Clause Cases, ubi supra.