Milton RUDOLPH, et al.,
Plaintiffs-Appellees,

v.

Milton F. STEINHARDT, et al.,
Defendants-Appellants.

No. 82–5647.

United States Court of Appeals,
Eleventh Circuit.

Dec. 27, 1983.
Rehearing Denied Feb. 3, 1984.

lease was entered into before 1977 and consequently does not come within the terms of the amendment.

## I. HISTORICAL BACKGROUND

Although the history of gold clauses and the United States gold standard does not directly affect our resolution of this case, it is helpful to see the whole historical terrain before we descend into our particular mine shaft. The monetary basis of the United States went through several metamorphoses during the nineteenth century; but in 1879, the nation finally settled on an "international gold standard." [3] Gold reserves backed up the paper currency, so that a person could redeem paper currency and receive gold coin. In 1900, Congress established an official value of the dollar in terms of gold. One dollar equalled twenty-five and eight-tenths grains of gold nine-tenths fine." [4] One could exchange paper money for gold of that weight and fineness. Put differently, the "official price" of one fine troy ounce of gold was set at $20.67. As a natural consequence of these acts, the money supply in the United States was limited by gold reserves.

When Franklin Roosevelt took office in 1933, he wished to inflate domestic prices and increase the money supply. Therefore, he took the United States off the gold standard.[5] Citizens could no longer demand gold from the U.S. Treasury in exchange for paper bills. At the same time, Roose-

Blackwell, Walker, Gray, Powers, Flick & Hoehl, Diane H. Tutt, James C. Blecke, Miami, Fla., for defendants-appellants.

Hyman & Kaplan, P.C., Michael L. Hyman, Miami, Fla., for plaintiffs-appellees.

Before GODBOLD, Chief Judge, ANDERSON, Circuit Judge, and GOLDBERG *, Senior Circuit Judge.

GOLDBERG, Senior Circuit Judge:

In 1849, the cry of "Gold!" rang out from the banks of the American River in California. In 1933, the halls of Congress echoed with a ban on gold clauses in American contracts.[1] Our case involves a modern prospector, panning for security in the rivulets of commerce. His tool is a lease provision that increases rent payments in proportion to official devaluations of the United States dollar. We hold that he has struck gold; but, alas, he cannot keep it. The rent provision is a gold clause and therefore violative of 31 U.S.C. § 463. Moreover, although Congress amended the statute on October 28, 1977,[2] we hold that the lease provision is invalid even with respect to rental payments due after that date. The

---

\* Honorable Irving L. Goldberg, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

**1.** Joint Resolution of June 5, 1933, Cr. 48 § 1, 48 Stat. 112, 113 (1933) (codified at 31 U.S.C. § 463). Many of the provisions of Title 31 were recodified in 1982. Former section 463 is now codified in slightly different form at 31 U.S.C.A. § 5118(d) (1983). The wording changes have no bearing, however, on the particular issues decided here. Any changes in the relevant provisions were designed primarily "to eliminate unnecessary words." H.Rep. No. 97–651, 97th Cong., 2d Sess. 156 (1982), *reprinted at* 1982 U.S.Code Cong. & Ad.News 1895, 2050. The crucial phrases are still the same. *See infra* note 18.

In the interest of simplicity, we will cite to section 463.

**2.** Act of October 28, 1977, Pub.L. No. 95–147, § 4(c), 91 Stat. 1227, 1229 (codified at 31 U.S.C.A. § 5118(d)(2) (1983)) [hereinafter cited as 1977 amendment].

**3.** Dam, *From the Gold Clause Cases to the Gold Commission: A Half Century of American Monetary Law,* 50 Chi.L.Rev. 504, 506–507 (1983).

**4.** Act of Mar. 14, 1900, ch. 41, § 1, 31 Stat. 45; Dam, *supra* note 3, at 507.

**5.** *Id.* at 504.

velt officially devalued the dollar,[6] proclaiming a new gold content of 15⁵⁄₂₁ grains nine-tenths fine.[7] The official price of gold rose correspondingly from $20.67 to $35.00 per ounce. An official price was still meaningful, because the Treasury could buy gold from citizens in exchange for paper currency. Indeed, all gold coin was to be withdrawn from circulation.[8]

Other elements of Roosevelt's monetary program were a ban on gold hoarding[9] and the invalidation of gold clauses in contracts. As we shall discuss later, a gold clause is a provision requiring "payment in gold or a particular kind of currency, or in an amount of money measured thereby."[10] One purpose of the Joint Resolution banning such clauses was to prevent creditors from enforcing the clauses after the 1934 devaluation of the dollar.[11] A second purpose, according to the Supreme Court, was to ensure that future debt payments would not fluctuate relative to the value of the paper dollar.[12]

The United States ceased to buy and sell gold in 1971 but continued to maintain an official price.[13] A dollar devaluation on May 8, 1972, increased the official price of gold to $38 per ounce. A second devaluation on October 18, 1973, brought the official price to $42.22 per ounce.[14]

The anti-gold clause era ended in 1977. An amendment to section 463 declared that the section "shall not apply to obligations issued on or after the date of enactment of this section [Oct. 28, 1977]."[15]

## II. FACTS

### A. The Miner's Saga

Returning to the case at bar, our prospector is Milton F. Steinhardt, the developer of a condominium apartment project in North Miami Beach, Florida. The project is known as the Eastern Shores White House. For business reasons, title to the land is held in trust with Gladys Goldman—an employee of Steinhardt—as trustee.

On March 2, 1970, Goldman and Steinhardt entered into a 99-year ground lease, with Goldman as lessor and Steinhardt as lessee. The lease permitted Steinhardt to assign a pro-rata interest in the lease to each apartment owner as the units were sold. Upon purchase of an apartment and assignment of the lease interest, the individual unit owner would become liable for a pro-rata portion of the rental payments under the lease.

The lease contains a schedule of rental payments, payable quarterly and varying in amount from $90 to $135 per quarter depending upon the size of the apartments. In addition, the lease contains a clause that provides:

DEVALUATION: In the event that the United States Dollar should ever be officially devalued by the United States Government or replaced by a regular spe-

---

**6.** Devaluation occurs when the government increases the official price of gold. *See Samuelson, Economics* 649 (9th Ed.1973).

**7.** Gold Reserve Act of 1934, ch. 6, §§ 10, 12, 48 Stat. 337, 341–43; Dam, *supra* note 3 at 514. Roosevelt obtained Congressional authorization to devalue the dollar in early 1933. *Id.* at 511.

**8.** *Id.* at 514.

**9.** Executive Order of April 5, 1933, No. 6102; *see Holyoke Water Power Co. v. American Writing Paper Co.,* 83 F.2d 398, 400 (1st Cir. 1936).

**10.** 31 U.S.C. § 463 (1976).

**11.** *See* Dam, *supra* note 3, at 512.

**12.** See *infra,* p. 1329.

**13.** Dam, *supra* note 3 at 528.

**14.** *See* Record at 99. Finally, the United States abolished the official price of gold on April 1, 1978. Act of Oct. 19, 1976, Pub.L. No. 94–564, 94 Stat. 2660 (1976) (codified at 22 U.S.C. § 286a note Supp. II 1976); *see also* Sen.Rep. No. 94–1148, 94th Cong.2d Sess. 10–15, *reprinted at* 1976 U.S.Code Cong. & Ad.News 5935, 5944–49; *Boehringer Mannheim Diagnostics v. Pan American World Airways,* 531 F.Supp. 344, 351 (S.D.Tex.1981). We can ignore this event for the purposes of our case, however, because the lessor has continued to treat the last official price of gold as binding.

**15.** 31 U.S.C. § 463 n. (1976 Supp. I).

cie of a lesser value, then and in that event the rental to be paid by the Lessee to the Lessor or any purchase price to be paid to the Lessor by the Lessee shall be increased in proportion to said devaluation so that the rental to be paid to the Lessor or the purchase price of the property covered by this Lease to be paid to the Lessor, shall be the same in terms of actual value as the United States Dollar was on March 2, 1970.

Ground Lease, ¶ 29, Record at 24.[16] In short, rents would be escalated in proportion to official devaluations of the dollar. Steinhardt's stated reason for including the devaluation clause was to maintain the real buying power of rents received from the unit owners. Appellant's Brief at 13–14.

He was content for a few years with the original rent levels. However, in 1974, the gold bug bit Steinhardt. He wrote to the Department of the Treasury on Dec. 2, 1974, inquiring about the percentage devaluation of the dollar since 1970. He struck pay dirt. The response from the Treasury explained that the dollar was devalued by 7.98% in 1972, and by another 10% in 1973. Steinhardt subsequently informed the unit owners that their rents would be increased, in part because of the "Gold Devaluations" of 1972 and 1973. *See, e.g.,* Letter to Wilfred Frank, February 26, 1975, Record at 98; Letter to Joseph Nichols, August 6, 1975, Record at 100.

### B. Excavations by the Trial Court

The unit owners began making the escalated payments. However, on December 5, 1978, three of the owners and their spouses brought an action against Steinhardt and Goldman in the United States District Court for the Southern District of Florida. The plaintiffs sued as individuals and as representatives of the class of unit owners. They challenged the escalation provision,

*inter alia,* as a "gold clause" violating section 463.

The district court ruled in their favor and awarded damages in an amount equal to the sum illegally collected by the defendants pursuant to the devaluation clause, *prior* to October 28, 1977. The trial court initially permitted the defendants to escalate rents due on or after October 28, 1977. That holding was based on the 1977 amendment to Section 463.[17] In a subsequent order, however, the court amended its Conclusions of Law and held that the lease obligation was issued prior to October 28, 1977. Therefore, the escalation of *any* rents pursuant to the devaluation clause was unlawful; and the plaintiffs could recover all monies collected in violation of section 463. The defendants Steinhardt and Goldman [hereinafter referred to collectively as "Steinhardt"] took an appeal from that judgment.

### III. DISCUSSION

#### A. Section 463

Section 463 provides in pertinent part:

(a) Every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of currency, or in an amount in money of the United States measured thereby, is declared to be against public policy; and no such provision shall be contained in or made with respect to any obligation hereafter incurred. Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts.....

(b) As used in this section, the term "obligation" means an obligation ...

---

**16.** The lease also contains a provision for the future escalation of rental payments based on fluctuations in the Consumer Price Index. The plaintiffs have challenged that provision in the state courts, *see Steinhardt v. Rudolph,* 422

So.2d 884 (Fla. 3d D.C.A., 1982). The provision is not at issue here and is irrelevant to our consideration of this case.

**17.** *See* note 2, *supra.*

payable in money of the United States. . . .

31 U.S.C. § 463 (1976).[18]

### B. There's Gold In Them Thar Bills

A straightforward application of the statute convinces us that the devaluation provision in Steinhardt's ground lease is a gold clause. As mentioned, devaluation of the dollar occurs when the government increases the official price of gold.[19] The provision in the Steinhardt lease escalates rental payments in proportion to such devaluations. The payments represent the same number of ounces of gold (as determined by the official price) as they did on March 2, 1970. The value of each payment is, in effect, measured by a quantity of gold. Section 463 forbids

> [e]very provision which purports to give the obligee a right to require payment in . . . an amount of money of the United States measured [by gold].

31 U.S.C. § 463. Therefore, the statute on its face proscribes Steinhardt's devaluation clause.[20]

Our prospector responds, however, that we are confusing iron pyrite with true gold. Steinhardt argues that the devaluation clause is not within section 463, because the clause keys rental payments to the *official* price of gold rather than the *market* price. He claims that the gold clause prohibition applies only to obligations which require payment in an amount of money measured by the market value of gold. Section 463 was enacted at a time when gold was still traded among individuals; and they would have used the market price. Arguably, Congress only contemplated gold clauses based on the market price.

 Steinhardt also points out that there is a great disparity today between the market value of gold and the official price. The increase in rents because of the devaluation clause was less than if the rents had been tied to the market price of gold. Steinhardt concludes that section 463 should not apply.

We disagree. Section 463 does not ignore rent clauses triggered by official devaluations of the dollar. On the contrary, one purpose of the statute was to prevent creditors from enforcing gold clauses to increase payments after the 1934 devaluation.[21] Thus, the Supreme Court, in *Holyoke Water Power Co. v. American Writing Paper Co.,* 300 U.S. 324, 57 S.Ct. 485, 81 L.Ed. 678 (1937), invalidated a lease provision having the same practical effect as the Steinhardt devaluation clause. The *Holyoke* lease provided for rental payments of

> a quantity of gold which shall be equal in amount to fifteen hundred ($1500) dollars of the gold coin of the United States of the standard of weight and fineness of the year 1894, *or the equivalent of this commodity in United States currency.*

*Id.* at 333, 56 S.Ct. at 487 (emphasis supplied). The Court decided that both options—payment in gold or the equivalent in American currency—violated Section 463.

---

**18.** The newly recodified version provides:

(a) In this section—
(1) "gold clause" means a provision in or related to an obligation alleging to give the obligee a right to require payment in—
(A) gold;
(B) a particular United States coin or currency; or
(C) United States money measured in gold or a particular United States coin or currency. . . .
(D)(1) In this subsection, "obligation means any obligation . . . payable in United States money.
(2) An obligation issued containing a gold clause or governed by a gold clause is discharged on payment (dollar for dollar) in United States coin or currency that is legal tender at the time of payment. This paragraph does not apply to an obligation issued after October 27, 1977.

31 U.S.C.A. § 5118 (1983). The recodification does not affect the issues decided in this case. *See supra* note 1.

**19.** *See supra* note 6.

**20.** The Florida Court of Appeals has reached the same conclusion about a virtually identical devaluation clause in a lease. *See REC Centers v. Shaughnessy,* Fla.App., 407 So.2d 971, 974 (1981). *Cf. Avery v. J.L. Hudson Co.,* 17 Mich. App. 491, 169 N.W.2d 666, 668 (1969) ("equal purchase power" provision is a gold clause).

**21.** Dam, *supra* note 3, at 512.

It is the latter alternative which interests us here, because the Court of Appeals had determined that the provision mandated an escalation of rental payments from $1500.00 to $2539.69—i.e. in proportion to the 1934 dollar devaluation. *Id.* at 486; *Holyoke Water Power Co. v. American Writing Paper Co.*, 83 F.2d 398, 401 (1st Cir.1936).[22] The Supreme Court held that a provision increasing rents in proportion to the devaluation of the dollar was a gold clause within section 463.

> [T]he evil to be remedied ... includes transactions whereby a debt is to be discharged ... in dollars, if the number of the dollars is to be increased or diminished in proportion to the diminution or the increase of the gold basis of the currency.

300 U.S. at 339, 57 S.Ct. at 489–90. 300 U.S. at 339, 57 S.Ct. at 489–90.

■ Therefore, Steinhardt cannot contend that a devaluation clause would never have come within section 463. His argument must be that *Holyoke* is no longer applicable because of the current disparity between the official and market prices of gold. Again, we do not accept the distinction. There is no indication in the statutory language or legislative history that Congress intended to limit section 463 to gold clauses tied to any particular price. Rather, the Joint Resolution condemned every obligation which requires payment in an amount of money measured by gold. The Steinhardt devaluation clause clearly measures rental payments by an amount of gold. Whether or not that measurement is the same that the market would provide is irrelevant to the application of section 463.

Furthermore, to distinguish between official and market prices would frustrate one of the basic policies of section 463. In outlawing gold clauses, Congress intended to provide certainty to debtors and prevent debt payments from increasing when the dollar depreciated. As the Supreme Court stated:

> The comprehensive language of the Resolution was intended—as by its terms it did—to close "legal loopholes" contributing to "dislocation of the domestic economy which would be caused by such a disparity of conditions in which, it is insisted, those debtors under gold clauses should be required to pay $1.69 in currency while respectively receiving their taxes, rates, charges, and prices on the basis of $1 of that currency." Here, the admitted purpose of the [creditors' gold clause] was ... to afford creditors of United States obligations contractual protection against possible depreciation of United States money....
>
> The mischief Congress intended to end will not end if the ... provision of these bonds is held to be unaffected by the Resolution. *Congress sought to outlaw all contractual provisions which require debtors, who have bound themselves to pay United States dollars, to pay a greater number of dollars than promised.* The Resolution intended that debtors under obligation to pay dollars should not have their debts tied to any fixed value of particular money, but that their entire obligations should be measured by and tied to the actual number of dollars promised, dollar for dollar.

*Guaranty Trust v. Henwood*, 307 U.S. 247, 257–58, 59 S.Ct. 847, 852–53, 83 L.Ed. 1266 (1939) (emphasis added), *quoting Norman v. Baltimore & Ohio Rail Co.*, 294 U.S. 240, 315–16, 55 S.Ct. 407, 419, 79 L.Ed. 885 (1935); *see also* Joint Resolution of June 15, 1933, ch. 48, § 1, 48 Stat. 113 (preamble announcing the "declared policy of Congress to maintain at all times the equal power of every dollar"); *Holyoke Water Power Co. v. American Writing Paper Co.*, *supra*, 300 U.S. at 339, 57 S.Ct. at 489 (same).

---

**22.** On January 31, 1934, the official price of gold rose from $20.67 to $35.00 per ounce. In other words, the gold content of one dollar was reduced from 25⁸/₁₀ grains, nine-tenths fine, to 15⁵/₂₁ grains, nine-tenths fine. 83 F.2d at 401. In determining the proportionate increase of rents under the lease provision, the Court of Appeals multiplied $1500 by the fraction containing 25.8 as the numerator and 15⁵/₂₁ as the denominator. The product was $2539.69. *Id.*

$$1500 \times \frac{25.8}{15/521} = 2539.69$$

In the present case, the devaluation provision would require the unit owners to pay a greater number of dollars in rent than they originally paid under the lease. Such a result would frustrate the policy of section 463. Therefore, we decline to apply the asserted distinction between official and market prices of gold; we hold that the devaluation provision is a gold clause in violation of section 463.[23]

## IV. AFTER THE GOLD CLAUSE

■ Steinhardt's second contention on appeal is that the Joint Resolution went bust on October 28, 1977; even if the lease contained a gold clause, an amendment to section 463 permitted the application of the clause to any rents falling due on or after that date.

As mentioned, the amendment provides:

The joint resolution ... shall not apply to obligations issued on or after the date of enactment of this section [Oct. 28, 1977].

Pub.L. No. 95–147, § 4(c), 91 Stat. 1229, codified at 31 U.S.C.A. § 463 (1976 Supp. I). Steinhardt argues that under landlord-tenant law, each lease payment is a separate obligation which "is issued" when the payment is due. Therefore, the joint resolution does not apply to any rents due after October 28, 1977. Steinhardt particularly disputes the trial court's holding that the obligation was issued when the lease was created.

We disagree with Steinhardt and reach the same result as the trial court. The legislative history to the amendment reveals that the word "issued" was intended to mean "entered into." Senator Jesse Helms was the author of the amendment which he had originally introduced as S. 79 on January 10, 1977. At that time, Sen. Helms explained the meaning of the bill's language:

The text of my proposal is slightly different from that of the bill I have previously introduced on this topic. My bill, if approved, will make enforceable, gold clause *contracts entered into* after the enactment of the bill. It is intended to stand neutral with regard to the enforceability of gold clause obligations issued in the past.

123 Cong.Rec. 635 (1977) (emphasis supplied).

The bill was ultimately passed by the Senate on Oct. 11, 1977, as a rider to another bill affecting the Treasury Department. There was no debate of the Helms amendment; and only Sen. Helms explained the meaning of the bill. At the time, he introduced a letter from Henry Stockwell, Deputy General Counsel for the Treasury Department. The letter announced the Treasury's consent to the amendment and stated:

Senator Helms' amendment ... would repeal the Joint Resolution with respect to *obligations entered into* after the date of enactment of Section 4.

123 Cong.Rec. 33,219 (1977) (emphasis supplied). The House passed the amendment on October 14, 1977, with no debate and only a brief exhortation by Congressman Hansen. 123 Cong.Rec. 33,770 (1977).[24]

Courts are always reluctant to rely on the position of one Congressman to demonstrate Congressional intent. However, in this case, the evidence is particularly strong, for the speaker was the author of the bill, there were no other interpretations of the statutory language, and the bill was passed summarily based on Sen. Helms' explanation. Moreover, his construction of the word "issued" corresponds with its normal meaning in law; debts are normally issued when they are first entered into and made available to the creditor, not when

---

**23.** Nothing we have said in this discussion affects the validity of escalation clauses based on the consumer price index. They are not keyed to the value of gold in particular and, therefore, are not gold clauses.

**24.** Congressman Hansen did not discuss the specific language of the bill but merely gave general support to the policy of repealing Section 463. *Id.*

they ultimately come due.[25] Therefore, we hold that the 1977 amendment to section 463 does not apply to obligations entered into before October 27, 1977.

The Steinhardt lease contract was entered into on March 2, 1970. On that date, the lessee or his assigns became obligated to pay rents on the 99-year lease as they became due.[26] The 1977 Amendment, consequently, does not apply to any part of the lease; and the devaluation provision is invalid even with respect to rents due on or after October 28, 1977.[27]

## V. THE END OF THE RAINBOW

In conclusion, our metallurgical analysis of the Steinhardt devaluation provision reveals that it is a pure, unalloyed gold clause. True, the 1977 Amendment introduced a new gold rush in America; but our prospector set up his mining operation before then. His devaluation clause violates section 463 and cannot be used to mine further profits.

We have not delved into the gilded riches of Adam Smith or Milton Friedman; nor have we attempted to follow in the footsteps of their alchemic apostles to elucidate the monetary philosophy of yesterday or make economic prognostications for the future. We merely apply the law and conclude as we stated at the outset: Steinhardt has struck gold, but alas cannot keep it.

Accordingly, the judgment of the lower courts is given our golden AFFIRMATION.

AFFIRMED.

---

**25.** *See, e.g., Skelly Oil v. Phillips Petroleum,* 174 F.2d 89, 98 (10th Cir.1949); *Blythe v. Doheny,* 74 F.2d 799, 803 (9th Cir.1934); 19 C.J.S. Corporations § 1157 at 742; 22A Words and Phrases, Issue, 533; *cf. Gold Bondholders Protective Council v. Atchison, Topeka and Santa Fe Railway,* (Alaska), 649 P.2d 947, 950 (1982) (construing the 1977 amendment to section 463).

**26.** Under Florida law, if the lessee defaults, the landlord has the option to re-occupy the premises or to stand by, do nothing, and demand each installment of rent as it comes due under the lease. *See Williams v. Aeroland Oil,* 155 Fla. 114, 20 So.2d 346, 348 (1944); *Rashkin v. Pearce,* Fla.App., 400 So.2d 541, 542 (1981).

**27.** Again, the Florida Court of Appeals reached the same result in *REC Centers v. Shaughnessy, supra,* note 20, 407 So.2d at 972 n. 1.