80 F.3d 1377
 29 UCC Rep.Serv.2d 213, 96 Cal. Daily Op. Serv. 2438,
96 Daily Journal D.A.R. 4135
 Guy ADAMS, Bonnie L. Adams, Timothy Adams, Clifton Albright,
Janet Allot, et al., Marvin Klein, Mary Lou Miller, Dwight
W. Williams, Jo Ann Peterson, Ignacia Fuentes, Russel
Peterson, Janet Peterson, Central Life Assurance Co.,
Plaintiffs-Appellants,
v.
BURLINGTON NORTHERN RAILROAD COMPANY, a Delaware
Corporation, Burlington Northern, Inc., a Delaware
Corporation, Defendants-Appellees.
Guy D. ADAMS, Herb Bailey, Barnts Medical Specialties,
Benefit Trust Life Insurance Co., Tom Bradley, Donald L.
Brookhart, Central Life Assurance Co., Russell L. Clark,
DMN, Inc., Ray Eiford, Sherman A. Hill, Bryce A. James,
Frank C. Jones, Alan Russell Kahn, Robert M. Keenholts,
Manhattan Life Insurance Company, Standard Insurance
Company, Ellis R. Stanley, Trustmark Life Insurance Company,
Union Central Life Insurance Co., Irene E. Walters, Woodmen
of the World Life Insurance Society, John H. Zybura, for
their own behalf and on behalf of and as Class
representatives of all other persons similarly situated,
Plaintiffs-Appellants,
v.
CSX TRANSPORTATION, a Virginia corporation, Defendant-Appellee.
 Nos. 94-35461, 94-35618.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 14, 1995.
Decided April 10, 1996.
 
 Camden M. Hall, Foster Pepper & Shefelman, Seattle, Washington, Geoffrey P. Knudsen, Ann Mary Holmes, Donald B. Myers, Stoel, Rives, Boley, Jones & Grey, Seattle, Washington, for plaintiffs-appellants.
 Robert D. Joffe, Cravath, Swaine & Moore, New York City, Bruce D. Corker, Seattle, Washington; R. Harvey Chappell, Jr., Paul W. Jacobs, II, J. Tracy Walker, IV, Christian, Barton, Epps, Brent & Chappell, Richmond, Virginia, for defendants-appellees.
 Appeals from the United States District Court Western District of Washington; William L. Dwyer, District Judge, Presiding, No. CV-93-01590-WLD, John C. Coughenour, District Judge, Presiding, No. CV-93-1827-JCC.
 Before ALARCON and CANBY, Circuit Judges, and FITZGERALD,* District Judge.
 CANBY, Circuit Judge:
 
 
 1
 These cases arise from the efforts of bondholders to enforce "gold clauses" in railroad bonds issued almost a century ago. A gold clause requires payment of the bond's obligations in gold dollars valued at the time the obligation was undertaken. In 1933, Congress rendered such gold clauses unenforceable, 48 Stat. 112, 113 (1933), but then permitted them again in 1977, 91 Stat. 1227, 1229 (1977). The issues presented here are whether the 1977 legislation revived these ancient gold clauses, and whether various actions of the parties have created new, post-1977 obligations payable in gold. Our answer to both questions is "no."
 
 
 2
 The bondholders brought a class action to force the Burlington Northern Railroad Company ("Burlington Northern" or "Railroad") to pay the interest and principal of its gold bonds, issued in 1896 and 1921, in gold coin. Class representative Guy Adams appeals the district court's dismissal of the action under Fed.R.Civ.P. 12(b)(6) and 56. Because of the identity of issues in this case and Adams v. CSX Transportation, Inc., No. 94-35618, an appeal from the district court's dismissal of a class action to enforce the gold clauses in CSX Transportation ("CSXT") bonds, we consolidate the cases for purposes of this opinion. This Court has jurisdiction under 28 U.S.C. § 1291. We affirm the decisions of the district court in both cases.
 
 BACKGROUND
 
 3
 In 1896 and 1921, respectively, the Northern Pacific Railway and the Great Northern Railway Company issued millions of dollars in "Gold Bonds" to finance their expansion in the Midwestern and Northwestern states. The bonds each contain a "gold clause," requiring the obligor to pay upon maturity "the [face value number of] Dollars, gold coin of the United States of America of the present [1896 or 1921] standard weight and fineness." The clause also calls for annual interest payments at a rate of between three and four per cent, depending on the issue, to be made "in like gold coin."
 
 
 4
 Nearly $92 million of the Northern Pacific bonds and approximately $62 million of the Great Northern bonds remain outstanding. The bonds mature between January 1, 1997 and January 1, 2047. The Burlington Northern became obligor on these bonds in 1970, when Great Northern and Northern Pacific merged into it. Both issues trade on the major exchanges, at prices reflecting the market's belief that the Burlington Northern will continue to pay its obligations in current legal tender, rather than in gold coin of the relevant period. If the method of payment were to return to gold coin, the value of the bonds would increase by up to 2000 per cent.
 
 
 5
 Since the time the Burlington Northern became the obligor on the bonds, it has undergone a corporate reorganization, in which its name was changed, and several mergers. When it reorganized to effectuate a name change and to create a holding company, the Burlington Northern undertook a Supplemental Indenture under its new name "to authorize the unbroken continuity" of the Railroad's obligations to the bondholders.
 
 
 6
 After a 1981 merger with the Colorado & Southern Railway, the Railroad undertook another Supplemental Indenture. The Supplemental Indenture subjected the former assets of Colorado & Southern to a lien that the Railroad's mortgage trustee had been required to maintain on certain blocks of stock in order to secure payment on the bonds. The Railroad wanted to free the stock from the lien so that it could cancel the stock. The Railroad issued several other Supplemental Indentures, for the same purpose, after other subsequent mergers. None of the Supplemental Indentures created new debt.
 
 
 7
 In 1985, the Railroad sought the mortgage trustee's release of its lienhold on 1.9 million acres of undeveloped property that had previously served as partial security for the bond debt. A class of gold bondholders filed an action, with Alan Reivman as class representative, to prevent the lienhold release. In 1987, the Railroad negotiated a settlement with the bondholders (the "Reivman Settlement"), paying the class $35.5 million in exchange for their agreement to drop the action and cease opposition to the release. The settlement did not purport to create new bond obligations.
 
 
 8
 The CSXT bonds at issue in Adams v. CSX Transportation, Inc. have a history similar to the Railroad bonds. In 1899, the Columbus, Hocking Valley & Toledo Railway Company issued $20 million in bonds containing gold clauses that governed payment of the interest and the principal. In 1930, Hocking Valley merged into the Chesapeake & Ohio Railway ("C & O"). In 1987, C & O and CSXT, both of which were wholly owned by the CSX Corporation, merged, leaving CSXT as the surviving entity. CSXT executed a Supplemental Indenture in satisfaction of the original Hocking Valley Mortgage Agreement's requirements, in which it agreed to "assume the due and punctual payment of the principal and interest of all the Bonds issued under [Hocking Valley's first mortgage] according to their tenor...." Approximately $15.8 million of the original Hocking Valley Bonds remain outstanding.
 
 
 9
 In 1933, Congress passed a Joint Resolution ("the 1933 Statute") providing that any obligation containing a gold clause "shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts." Ch. 48, 48 Stat. 112, 113 (1933) (formerly codified at 21 U.S.C. § 463). The statute gave the obligor the option of paying its debts in any form of legal tender, including gold, and prevented any obligee from enforcing gold clauses in existing or future obligations. The Gold Reserve Act of 1934, however, foreclosed the obligor's option of paying in gold by banning the use of gold as legal tender. See Gold Reserve Act of 1934, ch. 6, 48 Stat. 340 (1934) (repealed). From 1933 forward, the railroads made the interest payments on their bonds in currency.
 
 
 10
 In 1977, Congress amended the 1933 Statute by providing that it did "not apply to obligations issued on or after the date of enactment of this section." 91 Stat. 1227, 1229 (1977). The 1933 statute and its amendment were then recodified in 1982 as follows:
 
 
 11
 An obligation issued containing a gold clause or governed by a gold clause is discharged on payment (dollar for dollar) in United States coin or currency that is legal tender at the time of payment. This paragraph does not apply to an obligation issued after October 27, 1977.
 
 
 12
 31 U.S.C. § 5118(d)(2). In 1985, Congress reauthorized the use of gold coin as legal tender when it provided for the minting of $50 "Gold Eagle" coins. See Gold Bullion Coin Act of 1985, Pub.L. No. 99-185, 99 Stat. 1177 (codified as amended at 31 U.S.C. § 5112 (1994)).
 
 
 13
 Adams filed these two class actions in the district court in 1993. In Adams v. Burlington Northern Railroad, No. 94-35461, Adams sought a declaration that the original terms of the bonds, requiring payment of annual interest and principal at maturity in gold coin of the time (1896 and 1921), are enforceable. Adams also sought damages accruing from the Railroad's failure to pay interest in gold coin from the time any new obligations issued, as determined by the court, to the present. The district court dismissed the action for failure to state a claim upon which relief could be granted, Fed.R.Civ.P. 12(b)(6), and found that the Railroad also had met its burden for a grant of summary judgment under Fed.R.Civ.P. 56.
 
 
 14
 Adams brought his second class action, Adams v. CSX Transportation, Inc., No. 94-35618, on behalf of all Hocking Valley gold bondholders. He sought a declaration that CSXT must make all future interest and principal payments in gold coin of the time (the year 1899) and damages for CSXT's failure to pay interest in gold from the time of the 1987 merger with C & O until the time of the judgment. The district court dismissed Adams' action for failure to state a claim under Fed.R.Civ.P. 12(b)(6).
 
 
 15
 Adams appeals from the district court's dismissal of his claim and summary judgment against him in his action against the Burlington Northern, and from the district court's dismissal of his action against CSXT.
 
 ANALYSIS
 I. Adams v. Burlington Northern Railroad
 
 16
 A. Standard of Review.
 
 
 17
 Adams contends that the district court's dismissal of his claim under Fed.R.Civ.P. 12(b)(6) was improper because the court considered material beyond the pleadings, and that the Railroad's motion should have been treated as a Rule 56 motion for summary judgment. We assume for purposes of decision that the district court entered summary judgment, and affirm on that basis. We review summary judgments de novo, viewing the evidence in the light most favorable to the non-moving party, to determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996).
 
 
 18
 B. The 1933 Statute and the 1977 Amendment.
 
 
 19
 Adams contends that the district court erred in determining that the 1933 Statute continues to render unenforceable gold clauses embodied in obligations issued before October 27, 1977. We reject that contention.
 
 
 20
 As now codified, the 1933 statute and its 1977 amendment are clear on their face.[1] Obligations payable in gold are discharged by payment in any United States legal tender, but that command does not apply to obligations issued after October 27, 1977.
 
 
 21
 The legislative history of the 1977 amendment supports this plain meaning. Senator Helms, sponsor of the bill amending the 1933 Statute, stated that the bill would "make enforceable, gold clause contracts entered into after the enactment of the bill. It is intended to stand neutral with regard to the enforceability of gold clause obligations issued in the past." 123 Cong. Rec. 633, 635 (1977). Senator Helms was aware of pending cases which were to decide the amendment's effect on pre-1933 gold bonds, and he stated his intent to allow courts to resolve that issue. See id. Almost immediately, one of the gold clauses in issue in this case was held unenforceable in Feldman v. Great Northern Ry. Co., 428 F.Supp. 979 (S.D.N.Y.1977). Feldman held that gold bonds issued prior to 1933 still could be paid "dollar for dollar, in legal tender of the United States," and need not be paid in gold. Id. at 987.
 
 
 22
 According to Adams, the 1933 Act (at least when combined with the 1934 abolition of gold as legal tender) created an impossibility defense to the payment of gold to the bondholders. He argues that the 1977 Amendment and the 1985 Act authorizing the use of gold as legal tender removed this "impediment," reviving the Railroad's obligations. This interpretation conflicts with the plain meaning of the 1933 statute. That statute does not simply forbid payment in illegal tender; it affirmatively authorizes payment in any tender legal at the time of payment. Indeed, gold was legal tender in 1933 and did not become illegal until enactment of the Gold Reserve Act of 1934, 48 Stat. 337, 340 (1934). The 1985 statute removes the barrier of the 1934 Act, but it does nothing to impair the 1933 statute. The effect of the 1985 statute is to permit the Burlington Northern to make payment in gold coins if it wishes to, but its debts are discharged if it pays in any legal tender. Section 5118(d)(2) so states.
 
 
 23
 C. Adams' Claim that the Bonds Were Issued After October 27, 1977.
 
 
 24
 Adams argues, in the alternative, that for purposes of the 1977 amendment the Railroad bonds were "issued" after October 27, 1977. He contends that sale and transfer of the bonds, as well as certain business transactions and reorganizations, such as mergers and a change in the security for the bond debt, effected a new issuance of bonds after 1977. Adams' claim raises a question of statutory interpretation regarding the meaning of the term "issued" in the 1977 Amendment.
 
 
 25
 The 11th Circuit has held that a lease obligation is "issued" within the meaning of the 1977 amendment when the lease is "entered into." Rudolph v. Steinhardt, 721 F.2d 1324, 1330 (11th Cir.1983); see also 123 Cong. Rec. 635 (1977). In the context of bonds, the term has a similar and even better-understood meaning. A bond obligation is "entered into," or "issued" when the bond first "comes into the hands of a holder, so executed and delivered as to bind the obligor." 6A Fletcher Cyc. Corp. § 2688 (1989). While the "date of issue ... usually means the arbitrary date fixed as the beginning of the term for which [the bonds] run," "in the sense in which the term [issued] is ordinarily used a bond is not issued until it is delivered to some one who claims it as a debt against the corporation." Id. Under Article 3 of the Uniform Commercial Code, which covers negotiable instruments, "an issue means the first delivery of an instrument to a holder or remitter." Id. Article 3 of the Uniform Commercial Code applies by analogy to bonds. Id. We adopt this interpretation and hold that bonds are "issued" within the meaning of the 1977 amendment when they are delivered to the first holder.
 
 
 26
 The Alaska Supreme Court has interpreted the meaning of "issued" in the 1977 Amendment in accordance with this ordinary understanding of the term. See Gold Bondholders, Etc. v. Atchison, Topeka & Santa Fe Ry. Company, 649 P.2d 947 (Alaska 1982). Gold Bondholders was an action brought by persons who in 1980 had purchased railroad bonds with gold clauses. Id. at 948. The railroad had originally issued the bonds in 1895. Id. The bondholders argued that the bonds had not been "issued" to them until they were delivered to them in 1980, so that the 1933 Act and 1977 amendment did not prevent them from enforcing the gold clauses. Id. at 950. The Alaska Supreme Court held that the gold clauses were unenforceable under the 1933 Act, explaining that it "[knew] of no authority which would consider each purchase of the bond after its first purchase to be a new issue of the bond." Id.[2]
 
 
 27
 Taking a different tack from that of the plaintiffs in Gold Bondholders, Adams frames his argument in terms of novation, arguing that new obligations to pay in gold arose after October 27, 1977. He argues that because a novation may result from the agreed substitution of an obligee on indebtedness, novations and, consequently, new issuances, occurred each time gold bonds were purchased and sold. This argument misunderstands the requirements for a novation,[3] and is inapposite in the context of bond obligations. Adams' novation argument is essentially the same as the argument that the Alaska Supreme Court rejected, and that we also reject for the same reasons. The date of issue of bonds is the date when they are first issued, not when they are resold.
 
 
 28
 Adams argues that novations also occurred when the Railroad undertook a Supplemental Indenture after a corporate reorganization in which it changed its name, and when it undertook Supplemental Indentures after several other mergers, some of which involved the substitution of different collateral to secure the debt. In support of his argument, Adams points to cases in which novations rendered gold clauses in leases enforceable. See, e.g., Wells Fargo Bank v. Bank of America, 32 Cal.App.4th 424, 38 Cal.Rptr.2d 521 (1995); Fay Corp. v. BAT Holdings I, Inc., 646 F.Supp. 946 (W.D.Wash.1986), aff'd sub nom. Fay Corp. v. Frederick & Nelson Seattle, Inc., 896 F.2d 1227 (9th Cir.1990).
 
 
 29
 Our response to this argument is much the same as our response to the contention that the sale of a bond constitutes a novation and new "issue." The date of issue of a bond is the date of first issue; the fact that the obligor has continued to be bound, or has agreed to continue to be bound, despite reorganizations and mergers, does not alter the controlling first issue date. Whatever may be the rule regarding transfer of leases, bonds must continue to be viewed as issued on the date of first issue. See Wells Fargo, 38 Cal.Rptr.2d at 528 n. 5 (stating that novation doctrine applicable to leases would not apply to bonds). For purposes of the 1977 amendment, determinations regarding the issuance date of a bond should "[focus] on the legal structure of the bonds and not novation." Id. (citing Gold Bondholders, 649 P.2d at 950).
 
 
 30
 If either the sale of bonds, or the merger of the obligor with an agreement to honor outstanding bonds, were to effectuate a new issue of the bonds, the prospective nature of the 1977 amendment would be almost entirely defeated in the major area of corporate bonds. It was the intent of the 1977 amendment to remain "neutral" concerning bonds issued prior to 1977, not to render virtually all of them payable in gold, which would be the effect were Adams' doctrine of novation applied to bond obligations. Moreover, the issuance of corporate bonds is subject to a well-developed, specialized body of law, and the general law of novation is not easily injected into that context. Although sometimes described as a specific type of contract, bonds are financial instruments inherently different from leases, which were at issue in the cases that Adams cites. Bonds are regularly sold and purchased in large, impersonal markets, by corporations that frequently undergo corporate changes, while leaseholds generally involve a small number of readily ascertainable and stable parties who can engage in the type of bargaining and mutual consent necessary for a novation. See 66 C.J.S. Novation § 8(b) (1950) ("the same parties necessary for the making of the original contract are essential to the making of the contract of novation"); see generally, 66 C.J.S. Novation §§ 8-21 (1950). We are unable to accept the view that Congress intended to alter so radically the obligations of bonds that have been in public circulation for nearly a century, when the language and history of its amendment suggests a contrary purpose. We conclude that none of the theories of novation advanced by Adams are sufficient to cause us to recede from the view that the Railroad's bonds were "issued" on the date of first issue, in 1896 or 1921, as the case may be.[4] They consequently are subject to the 1933 statute and may be paid with any legal tender.
 
 
 31
 D. Adams' Additional Claims.
 
 
 32
 Adams also contends that the 1933 Statute was unconstitutional. This issue has been litigated repeatedly and resolved; Congress's abrogation of the gold clauses was constitutional. See Norman v. B. & O. R.R. Co., 294 U.S. 240, 316, 55 S.Ct. 407, 419, 79 L.Ed. 885 (1935) (finding that Congress acted within the scope of its Constitutional powers in enacting the 1933 Statute); Guaranty Trust Co. v. Henwood, 307 U.S. 247, 259, 59 S.Ct. 847, 853-54, 83 L.Ed. 1266 (1939) (holding that the 1933 Statute did not offend the Fifth Amendment); Feldman v. Great N. R.R., 428 F.Supp. 979, 982, 984 (1977) (holding that the 1933 Statute still applied even after the emergency prompting it had abated).
 
 
 33
 Adams' argument regarding the Railroad's breach of an implied duty of good faith and fair dealing is misguided. The 1933 Act authorized the Railroad to discharge its bond obligations by payment of any legal tender; it did not create an "impediment" to payment which the Railroad had any good faith obligation to avoid. The Railroad was legally excused from meeting its original obligations under the gold clauses and remains so.
 
 
 34
 We have reviewed Adams' other arguments and find them to be without merit. We affirm the district court's judgment dismissing Adams' action against the Burlington Northern. Adams did not demonstrate that there are any disputed issues of material fact regarding whether the Railroad's bonds were first issued in 1896 and 1921, respectively. Nor did Adams demonstrate that additional discovery could lead to evidence raising a triable issue.
 
 
 35
 II. Adams v. CSX Transportation, Inc.
 
 
 36
 We review de novo the district court's Fed.R.Civ.P. 12(b)(6) dismissal of Adams' suit against CSXT. Stone v. Travelers Corp., 58 F.3d 434, 436-37 (9th Cir.1995).
 
 
 37
 Adams' claim against CSXT fails for the same reasons as his suit against the Railroad. There was only one issuance of Hocking Valley bonds, at the time of their sale in 1899. These original debt obligations continued, and were assumed in their entirety, by CSXT. The original Hocking Valley Indenture specified that in the event of a merger the successor corporation would assume the same obligation as the original obligor. No new debt was created, and the only relevant "obligation" for purposes of the 1977 Amendment was that which arose upon the issuance of the Hocking Valley bonds in 1899.
 
 
 38
 The 1933 Act bars the enforcement of the gold clauses in the CSXT bonds. We thus affirm the district court's dismissal of Adams' claim for failure to state a claim.
 
 CONCLUSION
 
 39
 We affirm the district court's dismissal of Adams' claims in both Adams v. Burlington Northern Railroad, No. 94-35461, and Adams v. CSX Transportation, Inc., No. 94-35618, because the gold bonds in both cases were "obligations issued" prior to October 27, 1977. Accordingly, the 1933 Act bars the bondholders from enforcing the gold clauses against the obligors.
 
 
 40
 AFFIRMED.
 
 
 
 *
 The Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation
 
 
 [1]
 The 1933 statute and the 1977 amendment were equally clear as separately enacted; the 1982 recodification was not intended to effect any substantive changes. See H.R.Rep. No. 651, 97th Cong., 2d Sess. 1-4 (1982), reprinted in 1982 U.S.C.C.A.N. 1895, 1895-98
 
 
 [2]
 The bonds at issue in Gold Bondholders contained terms stating that the bonds were transferable, and that any purchaser could surrender the bond and that "a new registered bond will be issued to the transferee in exchange therefor." Id. The Alaska Supreme Court nonetheless found that the 1933 Act was intended to vitiate such obligations "insofar as they required payment in gold specie," and was unpersuaded that the bonds were first issued to the bondholders in 1980. Id. at 950-51
 
 
 [3]
 Novations generally require that the parties intend to extinguish the old obligation and to create a new obligation. 66 C.J.S. Novation, § 11(b)(1). See also MacPherson v. Franco, 34 Wash.2d 179, 208 P.2d 641, 642 (1949)
 
 
 [4]
 Even if novation analysis were appropriate, the circumstances surrounding the corporate transactions in this case would not meet the formal requirements for a novation. Under Washington law, which applies in this case, a novation requires the substitution of a new obligation for an old one, and not merely of a new paper or note. Davis v. Gutheil, 87 Wash. 596, 152 P. 14, 16 (1915). All of these Supplemental Indentures expressly indicated a continuity of the original obligations to the bondholders, the old obligations were never extinguished, and no new obligor was substituted
 Adams also contends that the Reivman Settlement constituted a novation. Again, there was no new bond issuance because the Railroad did not undertake any new debt obligation.